17 December 1999

No. 2--98--1468 

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

ANGELO SORCE and JO-ANN SORCE, ) Appeal from the Circuit

) Court of Du Page County.

 Plaintiffs--Appellants,  )

  ) 

v. ) ) No. 95--L--2115

) 

NAPERVILLE JEEP EAGLE, INC.,  ) 

and AM GENERAL CORPORATION,  ) Honorable

) Edward R. Duncan,

Defendants--Appellees.  ) Judge, Presiding.

_________________________________________________________________

JUSTICE RAPP delivered the opinion of the court:

Plaintiffs, Dr. Angelo Sorce and his wife, Jo-Ann, appeal from partial summary judgment entered in favor of defendants, Naperville Jeep Eagle, Inc. (Jeep Eagle), and AM General Corporation (AM General), on the issues of revocation of acceptance, breach of warranty, and products liability.  We affirm in part and reverse in part.

I. FACTUAL BACKGROUND

In January 1993, Dr. Sorce purchased a new Hummer sports utility vehicle from Jeep Eagle.  Dr. Sorce intended to use the Hummer as his primary source of transportation. The truck was equipped with an electronic tire pressure regulator that allowed the driver to inflate or deflate the tires from inside the vehicle to accommodate the terrain.  The purchase price was $66,404.  

The truck was manufactured by AM General.  AM General provides a written 3-year or 36,000-mile, "bumper-to-bumper" manufacturer's limited warranty with every new vehicle purchased.  The terms of the limited warranty are spelled out in a manual consisting of 19 half-pages.  Page nine of the manual sets out what is entitled "LEGAL TERMS," which includes the following language in all capital letters:

"AM GENERAL DOES NOT GRANT TO ANY PERSON PERMISSION TO CREATE FOR IT ANY LIABILITY OR OBLIGATION ASSOCIATED WITH THIS VEHICLE THAT IS NOT WRITTEN IN THE 'NEW VEHICLE LIMITED WARRANTY.'

THE LIMITED WARRANTIES IDENTIFIED IN THIS MANUAL ARE THE ONLY WRITTEN WARRANTIES PROVIDED BY AM GENERAL CONCERNING THIS VEHICLE.

ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY.  PERFORMANCE OF REPAIRS AND NEEDED ADJUSTMENTS IS THE EXCLUSIVE REMEDY UNDER THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY. 

AM GENERAL WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES CAUSED BY FALSIFICATION, MISREPRESENTATION, OR BREACH OF THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY."

Jeep Eagle provided Dr. Sorce with a copy of the warranty manual at the time he purchased the truck. 

In August 1993, Dr. Sorce and Jo-Ann were in the truck returning home to Illinois from their cottage in Wisconsin.  At some point during the trip, the truck began to vibrate severely.  According to Jo-Ann, the vibration was so bad that she suffered a back injury that caused her considerable pain.  Acting as Jo-Ann's treating physician, Dr. Sorce opined that Jo-Ann's injuries were caused by the vibrations.  Dr. Sorce never opined that the vibrations were caused by a defect that existed at the time the truck left the factory.  Dr. Sorce requested and received a total tire replacement after the incident.

In his deposition, Dr. Sorce testified that the truck experienced problems from  day one--"there was always something wrong with it."  The problems included brake pedal vibration, severe tire and vehicle vibration, loss of air pressure in the tires, water leaks around the windows, mold from standing water under the carpeting, hood vibration, which required adjustment, and a persistent lack of heat on the driver's side.  The heat problem required three visits to fix, culminating in the replacement of the "heat box."  Dr. Sorce alleged that after the heat box replacement noxious fumes began emanating from the heat ducts due to the failure by the dealership to clean grease off the truck's manifold after the repair.  The fumes apparently caused numbness and tingling in Dr. Sorce's extremities and burning in his eyes.  Dr. Sorce brought the truck in for repair of the tire and vehicle vibration 18 times between March 1993 and September 1995.  Allegedly, the problems never were adequately fixed.

From late in 1993 to the middle of 1994, Dr. Sorce claimed to have told the salesman at Jeep Eagle that he no longer wanted the "lemon" and wished to trade it in on another new Hummer.  According to Dr. Sorce, each time he told the salesman this, he received assurances that any problems would be fixed.  Jeep Eagle eventually offered Dr. Sorce a $20,000 trade-in allowance on the truck.  At the time, the truck had been driven approximately 23,000 miles.  Dr. Sorce did not think the trade-in offer was a fair deal; he wanted $54,000 for the truck.  Nonetheless, he continued to drive the truck because "[he] liked the vehicle to go where it could go, so [he] put up with it for awhile."

In May 1994, Dr. Sorce attended a Hummer rally in Dayton, Tennessee.  At the rally he drove his truck over extremely rough terrain and through as much as 30 inches of water.  He did this despite the fact that the truck had 22 warranty service visits since its purchase.

In September 1995, Dr. Sorce brought the Hummer to Jeep Eagle in an attempt to effectuate another warranty repair.  By this time the truck had been in for service over 30 times.  Jeep Eagle refused to make the repairs under the warranty because the vehicle had nearly 44,000 miles on it.  Through their attorney, plaintiffs sent written notice of revocation of acceptance to Jeep Eagle in October 1995.  Jeep Eagle refused the revocation of acceptance.

Plaintiffs brought suit against Jeep Eagle and AM General.  Their amended complaint contained four counts.  Counts I and II alleged, respectively, breach of express and implied warranties under the Magnuson-Moss Warranty Federal Trade Commission Improvement Act (Magnuson-Moss Act, Magnuson-Moss, or Act) (15 U.S.C. §2301 
et seq.
 (1994)) against both defendants and sought regular, incidental, and consequential damages.  Count III alleged revocation of acceptance under Illinois' version of the Uniform Commercial Code  (UCC) (810 ILCS 5/1--101 
et seq.
 (West 1994)) against Jeep Eagle; and count IV alleged products liability against both defendants.

Michael Truesdale was retained by plaintiffs as an automobile expert.  Truesdale was a high school shop teacher with a master's degree in educational administration and certifications as a master engine machinist and master automotive technician.  He did not have an engineering degree.  In college, Truesdale took industrial courses, including welding and materials science.  In his deposition, Truesdale testified that he had built or reconditioned several race cars in the past.  Truesdale "examined" the Hummer in November 1995.  His examination entailed riding in the passenger seat while Dr. Sorce drove around the neighborhood.  During the ride Truesdale placed a thermometer near the heating ducts and asked Dr. Sorce numerous questions.  Truesdale later submitted a "report" that consisted of "[his] notes from the vehicle inspection [he] performed on [the] Hummer."  The "report" summarized Truesdale's understanding of Dr. Sorce's "primary concern" which was "the permanent presence of mildew in the Hummer."  The "report" went on to note that the temperature of the heat coming from the ducts was about 30 degrees lower than normal.  The "report" offered no opinions to any degree of certainty as to the condition of the truck when it left AM General's factory.  Nor were such opinions offered by Truesdale during his deposition.

Defendants moved for summary judgment on all counts.  On count I (breach of express warranty), the trial court denied summary judgment to both defendants but prohibited recovery for incidental and consequential damages against AM General.  On count II (breach of implied warranty of merchantability), the trial court denied summary judgment to Jeep Eagle and granted it to AM General.  On counts III and IV (revocation of acceptance and products liability), the trial court granted summary judgment to both defendants.  

Plaintiffs timely appealed.  On appeal, plaintiffs contend that summary judgment was improper (1) because the issues of attempted revocation of acceptance and products liability involve disputes over material facts; (2) 
because,
 
as a matter of law, AM General's limited warranty improperly excluded incidental and consequential damages for breach of warranty; and (3) 
because,
 
contrary to the trial court's conclusion, an action for breach of implied warranty of merchantability may be maintained under the Magnuson-Moss Act concurrent with an action for breach of express warranty.

II. DISCUSSION

A. Standard and Scope of Review

Because this case comes to us from an order granting summary judgment, we apply a 
de novo
 standard of review.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113 (1995).  While drastic, summary judgment is at the same time an efficient mechanism for disposing of issues or entire cases raising purely legal questions. 
 
Espinoza
, 165 Ill. 2d at 113.
  In adjudicating a summary judgment motion, evidence
 is construed liberally in favor of the nonmovant.  
Guerino v. Depot Place Partnership
, 273 Ill. App. 3d 27, 30 (1995).  
A party's right to summary judgment must be clear and free from doubt.  
Espinoza
, 165 Ill. 2d at 113.  We will affirm an order of summary judgment when our independent review of the record reveals two elements.  First, the pleadings, depositions, and admissions together with affidavits, if any, demonstrate no genuine dispute over material facts and, second, the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 1998).
  With these principles in mind we turn to the merits of plaintiffs' arguments.  

B. Revocation of Acceptance

Plaintiffs first contend that the trial court improperly granted summary judgment "as a matter of law" on the issue of revocation of acceptance because there exists a genuine dispute over material facts.  Defendants counter that summary judgment was proper as a matter of law given the undisputed fact that Dr. Sorce attempted revocation of acceptance well after both discovery of the alleged problems and the expiration of the limited warranty period.

In Illinois, sales of goods, including automobiles, are governed by the UCC.  Under the UCC, a buyer may reject goods that "fail in any respect to conform to the contract."  810 ILCS 5/2--

601 (West 1994).  The rejection of goods must occur within a reasonable time after delivery, and the rejection "is ineffective unless the buyer seasonably notifies the seller."  810 ILCS 5/2--

602 (West 1994).  Where a buyer does not validly reject goods, the goods are deemed to have been accepted.  810 ILCS 5/2--606(b) (West 1994).  

When goods have been accepted, a buyer may revoke acceptance when a nonconformity substantially impairs the value of previously accepted goods to the buyer.  810 ILCS 5/2--608(1) (West 1994).  The right to revocation of acceptance arises when the buyer accepts goods:

"(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."  810 ILCS 5/2--608(a), (b) (West 1994).

In either case, revocation of acceptance must be made within a reasonable time after the buyer discovers or should have discovered the ground for revocation.  810 ILCS 5/2--608(2) (West 1994).  Revocation of acceptance is not effective, however, until the buyer notifies the seller of it.  810 ILCS 5/2--608(2) (West 1994).  Such notification need not be in any particular form or use particular language.  
Boysen v. Antioch Sheet Metal, Inc.
, 16 Ill. App. 3d 331, 332 (1974).

A buyer who chooses to revoke acceptance of goods has the same duties as if the buyer had rejected the goods.  810 ILCS 5/2--

608(3) (West 1994).  Thus, notice of revocation must be given within a reasonable time after the buyer discovers or should have discovered any breach or the buyer is barred from any remedy with regard to that breach.  See 810 ILCS 5/2--607(3)(a) (West 1994).  Revocation of acceptance is considered a remedy available to a buyer in an action for breach of warranty.  See 810 ILCS Ann. 5/2--

608 Uniform Commercial Code Comment 1 (Smith-Hurd 1993).

Thus, the issue of the validity of an attempted revocation of acceptance in most instances hinges upon material questions of fact.  See 
Boysen
, 16 Ill. App. 3d at 332.  The trier of fact must determine whether the alleged nonconformities in the goods caused substantial impairment to the buyer.  See 
GNP Commodities, Inc. v. Walsh Heffernan Co.
, 95 Ill. App. 3d 966, 978 (1981)(substantial impairment is measured in terms of the particular needs of the buyer).  The factual question of whether the attempted revocation of acceptance was timely (see 810 ILCS 5/1--204(2) (West 1994) or whether delay in buyer's attempted revocation of acceptance was reasonably induced by the seller's continued assurances that repairs would be successful must also be resolved.  See 
GNP Commodities
, 95 Ill. App. 3d at 974 (the reasonable time for revocation of acceptance may be extended if the seller gives continuous assurances); 
North American Lighting, Inc. v. Hopkins Manufacturing Corp.
, 37 F.3d 1253, 1257-58 (7th Cir. 1994).

Here, during the warranty period, Dr. Sorce sought service for problems with the Hummer over 30 times.  Jeep Eagle assured Dr. Sorce that the problems would be fixed and, in fact, attempted repairs each time.  According to Dr. Sorce, most of the repairs were totally or partially unsuccessful.  At one point prior to expiration of the warranty period Dr. Sorce allegedly told the salesman at Jeep Eagle that he no longer wanted the "lemon" and wished to trade it in on another new Hummer.  According to Dr. Sorce, each time he would tell the salesman that the truck was defective he would receive assurances that the problems would be adequately fixed.  Yet, Dr. Sorce continued to use the truck because "[he] liked the vehicle to go where it could go."   Only after repeated attempts to repair the problems had failed did Dr. Sorce attempt to revoke acceptance of the Hummer.  At the time the truck had 43,000 miles on it--7,000 miles more than provided for in the limited warranty.  We believe that different inferences could be drawn from these facts and, as such, genuine issues of material fact exist as to whether the alleged defects caused substantial impairment to Dr. Sorce and whether the attempted revocation was timely.  Summary judgment was therefore inappropriate.

C. Exclusion of Incidental and Consequential Damages and

Limitation of the Implied Warranty of Merchantability

Plaintiffs next make two related arguments.  First, plaintiffs contend that the trial court improperly prohibited recovery for incidental and consequential damages against AM General.  The trial court found that AM General's exclusion of such damages in its written limited warranty met the requirements of the Magnuson-Moss Act because the language was "sufficiently conspicuous."  Therefore, according to the trial court, the exclusion was valid as against plaintiffs.  Plaintiffs contend that the exclusion is invalid because it does not appear "on the face of the warranty" as required by the Magnuson-Moss Act.

Second, plaintiffs contend that the trial court improperly granted summary judgment to AM General on the issue of breach of implied warranty of merchantability.  The trial court found that, "as long as the implied warranty of merchantability is limited to the duration of the express warranty," a party may maintain an action only for breach of express warranty.  According to plaintiffs, the trial court's decision in essence equated the limitation of the implied warranty of merchantability with the disclaimer of it.  Plaintiffs maintain that under Magnuson-Moss and the UCC this was improper.  We note that plaintiffs do not challenge the validity of the limitation itself.

This is an issue of statutory interpretation.  In construing a statute, it is our duty to give effect to and ascertain the intent of the legislature.  
Zekman v. Direct American Marketers, Inc.
, 182 Ill. 2d 359, 368 (1998).  In upholding this duty, we first look to the express language, as it is usually the best indicator of legislative intent.  
Nottage v. Jeka
, 172 Ill. 2d 386, 392 (1996).  Statutory language that is clear and unambiguous requires that we not resort to other aids of statutory construction.  
Bridgestone/Firestone, Inc. v. Aldridge
, 179 Ill. 2d 141, 149 (1997).  It is improper for us to depart from the plain language by reading into the statute exceptions, limitations, or conditions which are not clearly expressed.  
Bridgestone/Firestone
, 179 Ill. 2d at 149.

Magnuson-Moss provides a private right of action by a consumer purchaser of a consumer product against a manufacturer or retailer  failing to comply with the Act or the terms of a written warranty or any implied warranty arising therefrom.  15 U.S.C. §2310(d)(1) (1994).  The Act was adopted "[i]n order to improve the adequacy of information available to consumers, prevent deception, and to improve competition in the marketing of consumer products."  15 U.S.C. §2302(a) (1994).  

In analyzing Magnuson-Moss issues, it must be kept in mind that in the first instance the UCC governs sales of goods, including accompanying warranties.  Thus, written warranties provided with consumer goods must be examined in light of the requirements of both the UCC and Magnuson-Moss.  Only to the extent that Magnuson-Moss is applicable to the sale of consumer goods does it supercede inconsistent provisions of the UCC.  
Murphy v. Mallard Coach Co.
, 179 A.D.2d 187, 192, 582 N.Y.S.2d 528, 531 (1992).  Because the scheme of the Magnuson-Moss Act and the Federal Trade Commission regulations promulgated pursuant to it can be tricky to negotiate, a discussion of the scheme is necessary before addressing the merits of plaintiffs' arguments.

Magnuson-Moss requires a supplier who gives a written warranty that covers a "consumer product" costing more than $10 to meet certain minimum disclosure and designation requirements.  The product must be sold to a "consumer."  15 U.S.C. §§2302, 2303 (1994).  However, nothing in the Act requires a supplier of consumer products to give a written warranty; the Act only applies when a supplier chooses to do so.  15 U.S.C. §2302(b)(2) (West 1994).

According to the Act, a "supplier" is any business person who makes a consumer product directly or indirectly available to consumers.  15 U.S.C. §2301(4) (1994).  A "warrantor" is any supplier or other person who gives a written warranty or who is or may be obligated under an implied warranty.  15 U.S.C. §2301(5) (1994).  A "consumer product" is "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."  15 U.S.C. §2301(1) (West 1994).  This has been interpreted to mean that a consumer product is any product whose use for personal, family, or household purposes is not uncommon.  This includes automobiles.  16 C.F.R. §700.1(a) (1994).  A "consumer" is a buyer of any consumer product (other than for purposes of resale).  15 U.S.C. §2301(3) (1994).

Under Magnuson-Moss a "written warranty" is:

"(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking."  15 U.S.C. §§2301(6)(A), (B) (1994).

See 16 C.F.R. §700.3(a) (1994). This is not the same as an express warranty under the UCC (810 ILCS 5/2--313 (West 1994)).  An express warranty under the UCC may be oral or may be created by description, sample, or model.  810 ILCS 5/2--313(b), (c) (West 1994).  There can be little dispute that the written limited warranty given by AM General with the purchase of its new vehicles is governed by Magnuson-Moss.

Section 103 of the Act requires a warrantor to "clearly and conspicuously" designate a written warranty as either a "full [statement of duration] warranty" or a "limited warranty."  15 U.S.C. §2303(a) (1994).  These designations have nothing to do with the duration of the warranty but rather are a simple way of informing the average consumer about the level of protection provided by the warranty.  In order for a warranty to earn the designation "full warranty," it must meet 
the minimum standards provided in section 104 of the Act (15 U.S.C. §2304 (1994)).  15 U.S.C. §2303(a)(1) (1994).  Any written warranty that does not meet the requirements of section 104 is a "limited warranty."  15 U.S.C. §2303(a)(2) (1994).  

Section 104 of the Act requires that a "full warranty" (1) must provide for repair within a reasonable time at no charge to the consumer and, if the product or part thereof cannot be repaired after a reasonable number of attempts, the buyer must be given the right to a refund or replacement at no charge (15 U.S.C. §§2304(a)(1), (a)(4) (1994)); (2) must not impose any limitation on the duration of any implied warranties (15 U.S.C. §2304(a)(2) (1994)); (3) must not exclude or limit consequential damages for breach of any written or implied warranty unless the limitation or exclusion appears conspicuously on the face of the warranty (15 U.S.C. §2304(a)(3) (1994)); and (4) must not impose any unreasonable duties on the consumer buyer (U.S.C. §2304(b)(1) (1994)).  The plain language of the statutory scheme makes it clear that these standards only apply to "full warranties"; "limited warranties" are not required to meet the standards.

Nonetheless, the Act specifically prohibits the 
disclaimer or modification
 of any implied warranty whether a warranty is designated "full" or "limited."  15 U.S.C. §2308(a) (1994).  But, in the case of "limited warranties," the Act permits implied warranties to be limited in duration to the duration of a written warranty of reasonable duration, as long as the limitation is conscionable, set forth in clear and unmistakable language, and prominently displayed on the face of the written warranty.  15 U.S.C. §§2304(a)(2), 2308(b) (1994); see 
General Motors Acceptance Corp. v. Jankowitz
, 216 N.J. Super. 313, 328, 523 A.2d 695, 702 (1987).  

To summarize, if a warrantor gives any written warranty ("full" or "limited"), there may be no 
disclaimer
 of any implied warranty.  If a warrantor gives a "limited warranty," the duration of any implied warranty may be 
limited
 (but not disclaimed) to the duration of the express warranty, but if a "full warranty" is given there may be no such limitation.  The exclusion of consequential damages is prohibited only if a "full warranty" is provided, unless the exclusion appears conspicuously on the face of the warranty.  See 15 U.S.C. §2304(a)(3) (1994) (requiring exclusions or limitations of consequential damages to "conspicuously appear[] on the face of the warranty").  

1. Exclusion of Consequential Damages

Plaintiffs contend that AM General's "limited warranty" improperly excluded consequential damages because the exclusion did not appear "on the face of the warranty" (see 16 C.F.R. §701.1(i) (1994) (defining "on the face of the warranty" as "the page on which the warranty text begins")) but instead appeared in all-

capital letters on page nine of the warranty manual.  Plaintiffs' argument misconstrues Magnuson-Moss and the UCC.

There simply is no provision in Magnuson-Moss dealing with the exclusion or limitation of consequential damages in "
limited warranties
," let alone a requirement that such exclusions or limitations conspicuously appear on the face of the warranty.  Because no such provision exists in the Act, the exclusion or limitation of consequential damages in "limited warranties" is by implication governed by the UCC.  See 
Murphy
, 179 A.D.2d at 193, 582 N.Y.S.2d at 531.  Section 2--719(3) of the UCC provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."  810 ILCS 5/2--719(3) (West 1994).  Nowhere in section 2--719, or anywhere in the UCC for that matter, is there a requirement that such limitation or exclusion be conspicuous or appear in any particular place.  Compare 810 ILCS 5/2--719(3) (West 1994) with 810 ILCS 5/2--316(2) (West 1994)(requiring exclusion or modification of implied warranties to be conspicuous).  

Plaintiffs do not argue that AM General's exclusion of incidental and consequential damages is unconscionable.  Even if plaintiffs did make such an argument it would be without avail.  We hold that the language "AM GENERAL WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES CAUSED BY FALSIFICATION, MISREPRESENTATION, OR BREACH OF THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY" appearing on page nine of the warranty manual is not unconscionable and more than meets the requirements of the UCC.

The cases cited by plaintiffs (
Blankenship v. Northtown Ford, Inc.
, 95 Ill. App. 3d 303 (1981), 
Anderson v. Farmers Hybrid Cos.
, 87 Ill. App. 3d 493 (1980), 
and 
Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.
, 68 Ill. App. 2d 297 (1965)) in support of their contention are inapposite because each deals, not with the limitation or exclusion of incidental and consequential damages, but instead with the disclaimer of implied warranties--two distinct matters.  The trial court in this case properly granted summary judgment with respect to the recovery of incidental and consequential damages against AM General.

2. Limitation of the Implied Warranty of Merchantability

Summary judgment in favor of AM General on the issue of breach of implied warranty of merchantability is quite a different matter.  In granting summary judgment in favor of AM General, the trial court stated:

"Let me explain to you how I view the statutory system.  You have here the Magnuson-Moss Act, which as I see it, as long as the implied warranty is limited to the duration of the express warranty, you basically have your action under the express warranty only." 

Plaintiffs contend the trial court in essence read a disclaimer of the implied warranty of merchantability into the limited warranty based upon the language "ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY." 

Magnuson-Moss authorizes suits by consumers against manufacturers for breach of both express and implied warranties.  15 U.S.C. §2310(d)(1) (1994); see 
Rothe v. Maloney Cadillac, Inc.
, 119 Ill. 2d 288, 295 (1988)(holding that under Magnuson-Moss, a manufacturer's express written warranty provides a basis to assert the manufacturer's breach of implied warranties).  A cause of action asserted for breach of an express warranty does not extinguish a concurrent cause of action for breach of implied warranties arising from the express warranty.  Such causes of action are separate and distinct from each other.  An implied warranty of merchantability can be breached without a breach of the accompanying express warranty.  For example, breach of an express warranty might occur if a manufacturer fails to repair or replace defective parts that are still under warranty.  On the other hand, breach of an implied warranty of merchantability would occur, for example, if the goods are not "fit for the ordinary purposes for which such goods are used."  810 ILCS 5/2--314(2)(c) (West 1994).  Such a breach can occur where the warrantor has attempted to repair or replace defective parts (and thus comply with the express warranty) but the attempts are unsuccessful at resolving the problems.  A claim for breach of implied warranty of merchantability is similar in certain respects to a claim for strict products liability.  See 
Garcia v. Edgewater Hospital
, 244 Ill. App. 3d 894, 902 (1993)(noting that a claim for the tort of strict products liability is essentially a claim for breach of implied warranty of merchantability "divested of the contract doctrines of privity, disclaimer and notice"); see also 
State Farm Fire & Casualty Co. v. Miller Electric Co.
, 204 Ill. App. 3d 52, 61 (1990).  We conclude that the trial court in this case erroneously determined that, because a claim for breach of express warranty was brought, a claim for breach of implied warranty merchantability is extinguished based upon the limitation of the duration of the implied warranty to that of the express warranty.  Summary judgment was therefore improper.

D. Products Liability

Plaintiffs' final contention is that the trial court improperly granted summary judgment on the issue of strict products liability because a material issue of fact exists as to whether there was a manufacturing or design defect in the Hummer.  We disagree.

Illinois has long applied the concept of strict tort liability set out in section 402(A) of the Restatement (Second) of Torts (1965) to products liability cases.  See 
Suvada v. White Motor Co.
, 32 Ill. 2d 612 (1965).  Strict products liability is not absolute liability.  
Korando v. Uniroyal Goodrich Tire Co.
, 159 Ill. 2d 335, 343 (1994).
  The manufacturer of a product is not an absolute insurer.  
Dixon v. Chicago & North Western Transportation Co.
, 151 Ill. 2d 108, 124 (1992).  To prevail on a theory of strict products liability, the plaintiff must prove the following three elements: (1) that the injury or damage resulted from a condition of the product manufactured by the defendant; (2) that the condition was an unreasonably dangerous one; and (3) that the condition existed at the time the product left the manufacturer's control.  
Korando
, 159 Ill. 2d at 343.  
Proof of these elements may be made inferentially, by either direct or circumstantial evidence.  
Sanchez v. Firestone Tire & Rubber Co.
, 237 Ill. App. 3d 872, 874 (1992). When circumstantial evidence is presented, it should, at a minimum, include either proof that tends to exclude other extrinsic causes or an expert opinion that the product contained an unreasonably dangerous defect at the time it left the manufacturer's control.  
Sanchez
, 237 Ill. App. 3d at 874.

In the typical products liability case, the determination of whether a product contains an unreasonably dangerous defect is a question of fact.  
Korando
, 159 Ill. 2d at 344.  While a plaintiff does not have to prove a specific defect (
McKenzie v. SK Hand Tool Corp.
, 272 Ill. App. 3d 1, 7 (1995)), in order to overcome summary judgment, enough evidence that some defect existed at the time the product left the manufacturer's control must be present 
in the pleadings, depositions, admissions, and affidavits
, if any, to create a genuine issue of material fact.  See 
Atwood v. Warner Electric Brake & Clutch Co.
, 239 Ill. App. 3d 81, 90 (1992).  Mere speculation, conjecture, or guess is insufficient to withstand summary judgment.  
Sanchez
, 237 Ill. App. 3d at 874.

In 
Sanchez
, summary judgment was granted despite deposition testimony by an expert for the plaintiff.  The appellate court affirmed, finding that the expert testimony indicated nothing more than a mere possibility that the product was defective.  The court noted the expert never tested the product, and the plaintiffs used the product for a substantial time before any injury occurred.  
Sanchez
, 237 Ill. App. 3d at 874-75; but 
cf.
 
Samansky v. Rush-

Presbyterian-St. Luke's Medical Center
, 208 Ill. App. 3d 377, 391 (1990)(reversing summary judgment where the plaintiff's expert rendered a specific opinion that a defect in the product was the proximate cause of the plaintiff's injury).

In our case, summary judgment was properly granted.  We have not found sufficient evidence in the record that points to any unreasonably dangerous defects that existed at the time the truck left AM General's control and that can be linked to either plaintiff's alleged injuries.  Dr. Sorce claims that noxious fumes emanating from the heating system caused numbness and tingling in his extremities and burning in his eyes.  Nevertheless, Dr. Sorce admitted that his symptoms did not start until the heating unit on the truck was replaced some 18 months after the truck was purchased, and the symptoms were most likely caused by the dealership's failure to clean grease off the manifold of the truck.  In other words, if any defect in the heating system was present, it did not exist until well after the truck left AM General's control and it was caused by Jeep Eagle, not AM General.

Jo-Ann claims that the truck's defective condition ("wobbly wheels") caused injury to her back.  Plaintiffs' automobile expert, Michael Truesdale, rode in the truck, noting that it had a hard ride.  Truesdale never conducted any tests or experiments on the wheels.  He never testified, issued a report, or gave an opinion to any degree of certainty that identified any defect or stated that such a defect, if present, existed at the time the truck left AM General's control.  Dr. Sorce also testified as an expert on the cause of Jo-Ann's injury.  In his opinion, the truck was the cause of Jo-Ann's injury.  Plaintiffs argue that this simple opinion was sufficient to create a genuine issue of material fact concerning the truck's defective condition.  " '[A] legal inference of defectiveness may not be drawn merely from evidence that an injury occurred.' "  
Norman v. Ford Motor Co.
, 160 Ill. App. 3d 1037, 1042 (1987), quoting 
Artis v. Fibre Metal Products
, 115 Ill. App. 3d 228, 232 (1983).  The fact that the Hummer vibrated severely is indicative of a problem with the truck.  However, standing alone, such a fact is insufficient to withstand summary judgment on the issue of strict products liability.  After the incident that allegedly caused Jo-Ann's injuries, Jeep Eagle replaced all four tires on the truck.  Dr. Sorce then attended a Hummer rally at which he drove the truck over extremely rugged terrain.  Moreover, the truck was equipped with an electronic tire pressure regulator which allowed the driver to inflate or deflate the tires from inside the vehicle and thereby regulate the smoothness of the ride.  To rule for the plaintiffs in this case we would have to engage in mere speculation, conjecture, or guessing.  Again, summary judgment was proper.

[Nonpublishable material removed under Supreme Court Rule 23.]

III. CONCLUSION

For the foregoing reasons we affirm summary judgment on plaintiffs' claim for products liability against both defendants and the trial court's prohibition on recovery of incidental and  consequential damages against AM General; we reverse summary judgment as to plaintiffs' claim for revocation of acceptance against Jeep Eagle and for breach of implied warranty of merchantability against AM General.  We remand this cause for further proceedings.

Affirmed in part and reversed in part; cause remanded.

HUTCHINSON and GALASSO, JJ., concur.