2018 IL App (1st) 172898

No. 1-17-2898

Fourth Division
December 20, 2018

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| TOME MILEVSKI and ANGELA MILEVSKI, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 16 L 08302 |
| v. | ) | |
| | ) | The Honorable |
| INGALLS MEMORIAL HOSPITAL, | ) | Kathy M. Flanagan, |
| | ) | Judge Presiding. |
| Defendant-Appellee. | ) | |
| | ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Burke concurred in the judgment and
opinion.

**OPINION**

¶ 1   The instant appeal arises from the trial court's grant of summary judgment in favor of defendant Ingalls Memorial Hospital (Ingalls) in connection with a negligence lawsuit filed by plaintiffs Tome and Angela Milevski after plaintiff Tome Milevski was injured while working for Siemens Medical Solutions USA, Inc. (Siemens), at Ingalls. For the reasons that follow, we affirm the trial court's grant of summary judgment.

¶ 2                              BACKGROUND

¶ 3   On August 13, 2015, plaintiff, Tome Milevski, and his wife, Angela Milevski, filed a two-count complaint against defendant, Ingalls, alleging that on January 20, 2015, plaintiff

was a telecommunications analyst employed by Siemens, who was performing work in the course of that employment in the telecommunications room at Ingalls.[1] While plaintiff was performing his work in the room, the complaint alleged that "the flooring gave way while plaintiff was standing on it causing injury to plaintiff." The complaint alleged that Ingalls was negligent in (1) failing to provide plaintiff with a safe place to work, (2) failing to reasonably and adequately inspect its property before inviting plaintiff to perform work, (3) causing or allowing damage to the flooring, and (4) failing to warn plaintiff of the flooring condition. The complaint alleged that as a result of Ingalls' negligence, plaintiff sustained injury. On September 23, 2015, Ingalls filed an answer denying liability.

¶ 4     On January 22, 2016, Ingalls filed a third-party complaint against Siemens,[2] plaintiff's employer, alleging that if Ingalls was found liable, Siemens was also contributorily negligent. On February 26, 2016, Siemens filed an answer denying liability. On January 4, 2017, Siemens filed a counterclaim against Ingalls, arguing that pursuant to a written agreement between Siemens and Ingalls, Ingalls owed Siemens complete indemnification of any damages sought against Siemens, as well as any amounts already paid by Siemens.

¶ 5     On May 13, 2017, Siemens filed a motion for summary judgment against Ingalls on the third-party complaint, arguing that Siemens owed no duty to protect plaintiff from defects on premises owned and controlled by Ingalls and that Siemens had no prior knowledge of the defects and therefore could not have done anything to prevent plaintiff's injury. Accordingly, Siemens argued that Ingalls' contribution action failed as a matter of law. On August 2, 2017, Ingalls filed a response to Siemens' motion for summary judgment, arguing that there were

---

[1]As the alleged fall and injury occurred to plaintiff Tome Milevski, we refer to Tome Milevski as the singular "plaintiff" for clarity. The second count of the complaint was for loss of consortium on behalf of plaintiff's wife Angela and was based on the same factual allegations.

[2]Siemens is not a party to the instant appeal.

material issues of fact with respect to the scope of Siemens' responsibilities, notice, and causation.

¶ 6        Also on August 2, 2017, Ingalls filed a motion for summary judgment against plaintiff, arguing that Ingalls had no notice of the allegedly dangerous condition on its property that caused plaintiff's injuries. Ingalls also argued that plaintiff had failed to establish that any of Ingalls' acts or omissions caused plaintiff's injury.

¶ 7        Attached to the motion for summary judgment was the affidavit of Jim Swanson, who managed information technology (IT) at Ingalls. Swanson averred that the telecommunications room in which plaintiff was injured was located in the lower level of one of Ingalls' hospital buildings and was split into two sections. The north side of the room contained two towers of telecommunications equipment: a tower of "66 Block wiring" on the left wall, which was called the "wall field," and a "IP voice/PBX tower" located slightly less than three feet to the south of the "wall field." These two towers were connected by a series of cables that were housed in a "raised floor cable management system," which consisted of "side-by-side hard plastic treads placed on top of a hard plastic base (approximately 4.25 inches tall and 32 inches wide) that contained 25 support posts." At the time of plaintiff's injury, "the raised floor consisted of three bases and six treads." According to Swanson, the raised floor was installed to permit telecom analysts like plaintiff to access the "wall field" without having to stand on the underlying cables. Swanson averred that the raised floor was present when he first began working at Ingalls in 2006 and he did not know when it had first been installed or by whom. Swanson further averred that the only people who accessed the raised floor in the telecommunications room were those individuals with whom Ingalls had contracted to work on its telecommunications system and that Ingalls "did not perform direct

work on, or maintain, the raised floor on the north side of the room." Swanson averred that, prior to plaintiff's fall, no one ever communicated to him any safety concerns with respect to the raised floor, and he never observed any documentation showing any falls on the raised floor or any concerns with its safety. Finally, Swanson averred that two of the three sections of the raised floor that were in existence when plaintiff fell remained in place and, since the date of plaintiff's fall, no one had communicated any concerns with the remaining two sections, including concerns that the floor or its base was unstable or otherwise unsafe.

¶ 8        Also attached to the motion for summary judgment were a number of deposition transcripts, beginning with plaintiff's deposition. Plaintiff testified that he was employed from October 2014 until April 2016 as a telecom analyst with Siemens, which involved his maintaining telephone lines at Ingalls, including their wiring and cabling. There were two types of telephone systems: Cisco telephones, which were connected through a switch in the telecom room, and "plain old telephone systems," which were connected through lines provided by AT&T. His direct supervisor at Siemens was David Gates, while Jim Swanson was his contact at Ingalls.

¶ 9        Plaintiff testified that he occasionally worked in Ingalls' telecom room, where there was a desk with a computer against one wall that permitted him to access the tickets for work that needed to be performed. In that same room, plaintiff was able to run "cross-connects" and provide dial tones to specific telephones throughout Ingalls. To do so, plaintiff would take wires that ran from the right-hand side of the room, where the Cisco switches and AT&T lines were located, and connect them with the "wall field" on the left-hand side of the room to activate a particular phone. Plaintiff explained that there was permanent cabling running across the floor connecting the two sides, which led to a location on the "wall field," and then

plaintiff would run a smaller cable from that location to the specific phone line on that same "wall field."

¶ 10    Plaintiff testified that he would be in the telecom room an average of three times per week, with two to three visits per day; each of the visits would last half an hour to an hour. He also observed Bryant Onojeta, a Siemens employee, and Carol Kaczmarzewski, an Ingalls employee, use the telecom room; when Kaczmarzewski used the room, she did so only to retrieve documents from the printer. Plaintiff also observed other telecom contractors enter and leave the room at various times. Plaintiff testified that Onojeta was also a telecom analyst and performed similar work as he did.

¶ 11    Plaintiff testified that of his two to three visits to the telecom room a week, he would walk over the raised flooring once or twice. He had never had any issues with the raised flooring prior to his fall, had never noticed it become unstable, and never noticed it cracking, bending, or breaking. Plaintiff had never heard anyone complain about the floor, nor had he noticed anyone falling from the floor. On the day of his fall, plaintiff testified that he was on the raised floor and, while he was stepping off of it, "[his] foot dropped down pretty hard and the panel *** did like a teeter-totter motion where it was in a 45-degree angle" and he twisted his ankle. Plaintiff was able to grab onto a portion of the wall to prevent his falling any further. Plaintiff "immediately" felt pain in his right knee and left work to return home; he was initially diagnosed with a sprained anterior cruciate ligament but an arthroscopy discovered a "loose body" that was causing his knee to lock periodically.

¶ 12    Plaintiff testified that prior to the fall, he had been walking back and forth across the floor and did not notice the flooring moving or making any noises while he walked across it. Plaintiff further testified that he took two steps without the flooring moving, then was injured

when he took a third step; part of his foot was on the flooring panel and part was off the flooring at the time he took the step. After he fell, plaintiff testified that he looked back at the flooring and noticed that the panel was off its track; plaintiff went to examine it more closely and noticed that "there [were] plastic pieces *** that [were] all broken up." He had never previously inspected the flooring and had never seen the flooring panels removed from their tracks. Plaintiff testified that he did not know whether the pieces had been broken prior to the incident or what caused them to break but testified that "[j]ust from looking at it, you can tell that it was dusty in the area. So it didn't look like it was a fresh piece." Plaintiff did not recall if the broken pieces were located at the same point on the floor at which he fell. When plaintiff left the room, he encountered Kaczmarzewski and informed her of what had occurred, showing her the area where he fell.

¶ 13    Next, attached to the motion for summary judgment was the deposition transcript of Swanson, who testified consistently with his affidavit that the raised flooring was installed prior to his beginning to work at Ingalls. Swanson also testified that periodically, Siemens employees would be required to raise and remove the panels in order to access the underlying cabling; Swanson testified that Siemens was responsible for maintaining the cabling, which would include inspecting the raised floor system that housed the cables and informing Ingalls of any safety issues. Swanson further testified that, after plaintiff's fall, he hired another company—Jamerson & Bauwens—to clean up the area and remove any "dead" cabling; in doing so, they were able to reduce the number of raised panels from six to four. One of the panels that was removed was the one that was allegedly responsible for plaintiff's fall. Swanson testified that he "rarely" visited the telecom room and that Ingalls did not perform any inspections of that room because "[w]e hired Siemens to make that room safe."

6

However, Swanson admitted that, when he worked for Siemens (which he had done prior to working for Ingalls), he had never inspected the raised flooring in the telecom room.

¶ 14    Next, in her deposition, Carol Kaczmarzewski testified that she was the supervisor of the telecom department at Ingalls and was working on the day of plaintiff's fall; her responsibilities concerned switchboard operations and did not involve supervision of contractors or work with the physical wiring of the systems. She was entering the telecom room in order to retrieve a document from the printer in that room when she encountered plaintiff, who informed her that he was going home because he had fallen. At the time of plaintiff's fall, no one else was in the telecom room. Kaczmarzewski was unaware of who originally installed the raised flooring, but testified that the floor had been present for the 30 years in which she had worked for Ingalls. To her knowledge, no one from Ingalls ever performed any inspections of the telecom room with respect to safety. Kaczmarzewski was unaware of any complaints about the flooring and had never observed anyone performing any repairs to the flooring as a result of such complaints.

¶ 15    In his deposition, Bryant Onojeta testified that he was working for Siemens as a telecom engineer at the time of plaintiff's fall and was present at Ingalls at on the day of the fall. Onojeta testified that he had walked on the raised flooring previously and, at times, it felt "unstable" because a panel was not set flush into its groove, so Onojeta would have to kick it or stomp on it to resettle it into the proper location; Onojeta never reported this "wobbling" to anyone because he did not consider it to be a problem with the flooring and felt no safety concerns. Onojeta looked under the flooring a day or two after plaintiff's fall and observed a broken piece; he did not know whether the flooring was broken prior to plaintiff's fall or how

it broke. Onojeta also walked across the flooring at that time and did not notice any instability.

¶ 16        In his deposition, David Gates testified that he was working for Siemens at the time of plaintiff's fall and was his immediate supervisor. Gates had only been inside the telecom room a few times and was not even aware that there had been a raised floor in the room prior to the date of plaintiff's fall. Gates was not at Ingalls at the time of the fall and first visited the room several days later with Swanson. Gates testified that the flooring had "no noticeable defects" and standing on it "seemed very stable and solid." However, when Swanson moved along the sides of the panel, pushing down with his weight, "the floor board came up in kind of a teeter-totter fashion when he put weight on one side." Swanson stepped off of the panel and both examined it; Gates testified that "it seemed like there was a piece of plastic missing from the floor board" that measured approximately six inches and formed part of the support. They attempted to locate the missing piece but were unable to do so. Gates testified that if they found any unsafe working conditions, his team was instructed to report such conditions either to him or to Swanson, but there were no reports concerning the raised floor prior to plaintiff's fall.

¶ 17        In her deposition, Michelle Gundich testified that she was an independent contractor working at Ingalls at the time of plaintiff's fall and that her work occasionally required her to enter the telecom room. In the telecom room, she used the raised flooring; she did not find the raised flooring unstable under normal use but noted that "if you jumped on it, *** it might raise a little." She testified that she was informed of plaintiff's fall on the day it occurred and took photographs for Gates, who was in New York at the time.

¶ 18        Finally, in his deposition, John Flynn testified that he was an electrician for Jamerson & Bauwens working at Ingalls and that Jamerson & Bauwens was responsible for putting cables and wiring in wherever it was needed at Ingalls. Flynn estimated that he had been in the telecom room 20 times over his career, both before and after plaintiff's fall. Flynn did not recall the raised floor being loose or unstable at any time prior to plaintiff's fall but testified that Jamerson & Bauwens was called in to remove cabling and repair the flooring after the fall. Flynn testified that the flooring had been in place prior to his beginning to work at Ingalls over 10 years ago.

¶ 19        Also attached to the motion for summary judgment were plaintiff's answers to interrogatories propounded by Ingalls, in which plaintiff stated that, prior to his fall, he had never had any concerns about the safety of the raised flooring and had never inspected the flooring for signs of wear or damage.

¶ 20        Finally, attached to the motion for summary judgment was the affidavit of Linda Conway, associate general counsel of Ingalls, who averred that her review of Ingalls' security department incident reports revealed no evidence of any accidents or reports of unsafe conditions associated with the raised floor in the telecom room from 1986 through the time of plaintiff's fall. Conway further averred that her review of the plant operations department's repair and work requests for the three years prior to plaintiff's fall revealed no repairs or requests for repairs made to the raised floor and no indication that there were any unusual or unsafe conditions associated with the raised floor prior to plaintiff's fall. Finally, Conway averred that, at the time of the fall, she was also Ingalls' safety officer and she never received any type of notice prior to plaintiff's fall that anyone had ever complained that the raised floor was unsteady or otherwise unsafe, or that there had been any accidents caused by

the raised floor. Accordingly, Conway averred that, "[t]o the best of my knowledge, and based on my investigation, Ingalls Memorial Hospital did not have any notice of any dangerous or unsafe conditions associated with the raised floor in the telecom room where Plaintiff claims to have fallen prior to January 20, 2015."

¶ 21    On August 7, 2017, five days after the filing of Ingalls' motion for summary judgment against plaintiff, the trial court entered an order denying Siemens' motion for summary judgment against Ingalls on its third-party complaint. In the same order, the trial court also granted Ingalls' motion for summary judgment against plaintiff, noting that plaintiff had not filed a response to the motion. With respect to plaintiff's complaint, the trial court found that there was no evidence in the record to support Ingalls' actual or constructive notice of the broken or defective condition of the flooring, nor was there evidence of a causal connection between any act or omission on the part of Ingalls and the condition of the floor or plaintiff's injury. Additionally, despite acknowledging that plaintiff did not plead such a cause of action in its complaint, the court also found that plaintiff had not established that Ingalls could be liable pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)). Accordingly, the trial court granted summary judgment in favor of Ingalls, which also rendered the third-party complaint against Siemens moot.

¶ 22    On September 6, 2017, plaintiff filed a motion to reconsider the entry of summary judgment, noting that the trial court had granted the motion before the motion had even been presented and without allowing plaintiff an opportunity to respond. Plaintiff argued that the trial court had failed to consider which party owed plaintiff a safe place to work, given that both Siemens and Ingalls denied such a duty and claimed that the other was responsible for safety. As a result, plaintiff argued that neither Siemens nor Ingalls ever inspected the room

10

for plaintiff's safety. Since Ingalls owned the property on which plaintiff was injured and controlled the worksite, plaintiff argued that the duty to keep the workplace safe fell on Ingalls. Plaintiff further argued that he was not required to show actual or constructive notice where the defective condition was related to Ingalls' business and there was some evidence that Ingalls or its agents caused the condition. Finally, plaintiff claimed that if the work area had been inspected, the condition of the flooring would have been discoverable, meaning that Ingalls had not acted with reasonable care in failing to inspect the workplace.

¶ 23    On October 16, 2017, the trial court entered an order denying plaintiff's motion to reconsider, reiterating its earlier findings that, while Ingalls may have owed plaintiff a duty of care, there was no evidence to support Ingalls' actual or constructive notice of the broken or defective condition of the flooring, nor was there evidence of a causal connection between any act or omission on the part of Ingalls and the condition of the floor or plaintiff's injury.

¶ 24    Plaintiff timely filed a notice of appeal, and this appeal follows.

¶ 25                                    ANALYSIS

¶ 26    On appeal, plaintiff argues that the trial court erred in granting summary judgment in Ingalls' favor. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform

the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 27 "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 28 In the case at bar, plaintiff argues that, at a minimum, he had raised questions of fact as to all elements of his negligence claim. "To recover on a negligence claim, the plaintiff must establish the existence of a duty owed by the defendant, a breach of that duty, and an injury proximately resulting from that breach." *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1063 (2001) (citing *Miller v. National Ass'n of Realtors*, 271 Ill. App. 3d 653, 656 (1994)). If the plaintiff cannot establish any element of his cause of action, summary

judgment for the defendant is proper. *Pavlik*, 323 Ill. App. 3d at 1063 (citing *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989)).

¶ 29    "Property owners have a duty to exercise ordinary care in maintaining their property in a reasonably safe condition." *Nguyen v. Lam*, 2017 IL App (1st) 161272, ¶ 20. A business owner breaches its duty to an invitee who slips on a foreign substance if (1) the substance was placed there by the negligence of the proprietor; (2) its servant knew of its presence; or (3) the substance was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the proprietor had constructive notice of the substance. *Pavlik*, 323 Ill. App. 3d at 1063 (citing *Hayes v. Bailey*, 80 Ill. App. 3d 1027, 1030 (1980)); see also *Olinger v. Great Atlantic & Pacific Tea Co.*, 21 Ill. 2d 469, 474 (1961).

¶ 30    In the case at bar, there is no dispute that there was no actual notice of any defect in the raised flooring. All of the deposition testimony, including from plaintiff, establishes that there were no complaints about the flooring prior to plaintiff's fall and that no one observed any problems with the flooring. However, plaintiff argues that Ingalls had constructive notice of the defect because it could have been discovered through a reasonable inspection. We do not find this argument persuasive. In order to establish constructive notice, time "is a material factor," and it is incumbent upon plaintiff to establish that the defect was present for a sufficiently long time to constitute constructive notice to the proprietor of the establishment. *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1040 (2000). In the case at bar, all of the evidence suggests that any defect in the raised flooring was not evident until the time of plaintiff's fall. The flooring had been in place for 30 years without any issues, and plaintiff testified that he had walked on the flooring immediately prior to the fall without incident. Plaintiff suggests that "[t]here is no evidence the condition would not have been detected" if

13

the flooring had been inspected. However, plaintiff has put forth no evidence of when the flooring actually broke, meaning that it is impossible to say that the condition could have been detected had it been inspected earlier. As noted, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce*, 309 Ill. App. 3d at 328. In the absence of any evidence as to how long the defect had been present, we cannot find constructive notice. See *Tomczak*, 315 Ill. App. 3d at 1040 (declining to find business owner liable where there was no evidence of how long water had been present). Accordingly, the trial court properly entered summary judgment against plaintiff where plaintiff failed to establish either actual constructive knowledge of any defects in the flooring.

¶ 31    We find unpersuasive plaintiff's argument that notice was not required in the instant case, relying on the rule set forth by our supreme court in *Donoho v. O'Connell's, Inc.*, 13 Ill. 2d 113 (1958). In that case, the plaintiff was injured when she slipped and fell on an object on the floor of the defendant restaurant. *Donoho*, 13 Ill. 2d at 116. At trial, the plaintiff testified that, after her injury, she observed a piece of partly smashed grilled onion lying on the floor in the area in which she had fallen, as well as a dark smear that appeared to be grease; when she examined her shoes after being taken to the hospital, she also observed a smear on the sole of one of her shoes. *Donoho*, 13 Ill. 2d at 116. No one else observed the grilled onion, but the restaurant's employees testified to the cleaning procedures of the restaurant and testified that the mark on the floor was most likely caused by the plaintiff's shoe heel. *Donoho*, 13 Ill. 2d at 117. The jury returned a verdict in favor of the plaintiff, but on appeal, the appellate court reversed and ordered the trial court to enter judgment notwithstanding the verdict in favor of the restaurant. *Donoho*, 13 Ill. 2d at 118.

¶ 32     The supreme court reversed the appellate court's judgment, finding that the negligence issue was properly submitted to the jury. *Donoho*, 13 Ill. 2d at 125. In its analysis, the supreme court noted that "where the foreign substance is on the premises due to the negligence of the proprietor or his servants, it is not necessary to establish their knowledge, actual or constructive [citation]; whereas, if the substance is on the premises through acts of third persons, the time element to establish knowledge or notice to the proprietor is a material factor. [Citation.]" *Donoho*, 13 Ill. 2d at 118. The supreme court further noted that the plaintiff made two arguments: first, that evidence was introduced establishing that the onion was on the floor through the negligence of the defendant's servants and, second, that even if it was dropped by a third person, it was on the floor for a sufficient period of time for its presence to have been discovered by the exercise of ordinary care. *Donoho*, 13 Ill. 2d at 118-19.

¶ 33     With respect to the first argument, the supreme court reviewed the law pertaining to the issue and found that certain patterns were apparent. First, when the foreign substance was unrelated to the proprietor's operations, notice was required, "since under such circumstances no inference could be drawn that the substance was more likely to have been dropped by defendant's servants than by third persons." *Donoho*, 13 Ill. 2d at 119. Second, even where the foreign substance was related to the proprietor's operations, where there was no further evidence as to how the substance came to be on the floor, notice was required. See *Donoho*, 13 Ill. 2d at 120-21. Finally,

> "[w]here, however, in addition to the fact that the substance on the floor was a product sold or related to defendant's operations, the plaintiff offers some further evidence, direct or circumstantial, however slight, such as the location of the substance or the business

practices of the defendant, from which it could be inferred that it was more likely that defendant or his servants, rather than a customer, dropped the substance on the premises, courts have generally allowed the negligence issue to go to the jury, without requiring defendant's knowledge or constructive notice." *Donoho*, 13 Ill. 2d at 122.

Reviewing the evidence presented at trial, the supreme court found that there was evidence that the foreign substance was closely related to the restaurant's business and that the circumstances surrounding her fall—including the location of the onion, the bus boy's cleaning practices, the fact that no one ate in the area after the bus boy cleared it, and the smear on the sole of the plaintiff's shoe—could lead to the reasonable inference that it was more likely that the onion was on the floor through the act of the restaurant's servant rather than by the acts of any customer. *Donoho*, 13 Ill. 2d at 124-25.

¶ 34      We find the facts and holding of *Donoho* to be completely inapposite to the factual situation present in the case at bar. Plaintiff merely argues that the *Donoho* rule applies because (1) the raised flooring was Ingalls' property and related to Ingalls' business and (2) there was no evidence that plaintiff or Siemens caused the damage to the floor. However, these assertions are not sufficient to remove the issue of notice from the analysis. As Ingalls notes in its brief, the *Donoho* rule has been generally applied in situations where a foreign object has been left on the floor of a business' premises. See *Donoho*, 13 Ill. 2d at 124 (grilled onion on floor of restaurant); *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 716 (1998) (board from wooden pallet placed in pathway of store); *Wind v. Hy-Vee Food Stores, Inc.*, 272 Ill. App. 3d 149, 156 (1995) (floor mat not fastened to floor of store). Additionally, even where it has been applied to a condition, as opposed to a dropped object, the rule has still been interpreted to require that the business owner *created* the condition. See

*Mueller v. Phar-Mor, Inc.*, 336 Ill. App. 3d 659, 668 (2000) (plaintiff struck by a sliding door at store that was not properly placed). In the case at bar, however, plaintiff's injury was not caused by a foreign object dropped on the flooring, nor is there any evidence that Ingalls engaged in any action that created the condition. Plaintiff does not explain why the *Donoho* court's analysis is applicable in the absence of these facts. Accordingly, we find plaintiff's reliance on *Donoho* unpersuasive and find the lack of notice dispositive to the instant appeal.

¶ 35    Since we have determined that summary judgment was properly granted based on the lack of notice to Ingalls, we have no need to consider whether plaintiff established the remaining elements of his negligence claim.

¶ 36                                          CONCLUSION

¶ 37    Summary judgment was properly granted in favor of Ingalls and against plaintiff because there was no evidence that Ingalls had either actual or constructive notice of any defects in the raised flooring prior to plaintiff's fall.

¶ 38    Affirmed.