2022 IL App (1st) 210960-U

No. 1-21-0960

Order filed September 14, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| VICTORIA SMITH, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19CH01583 |
| | ) | |
| WILLIAM E. LUCAS, DIANA LUCAS, and | ) | Honorable |
| FRED H. SMITH, LLC, | ) | Raymond W. Mitchell, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE BURKE delivered the judgment of the court.
Justices Gordon and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm in part and reverse in part the circuit court's entry of summary judgment, and we remand for further proceedings. We find that plaintiff failed to raise a genuine issue of material fact to show that she was a member of the business, and that the business was required to be dissolved, but we find that plaintiff raised a genuine issue of material fact as to the valuation of her share in the business.

¶ 2     This appeal arises following the circuit court's grant of summary judgment in favor of defendants William Lucas, Jr. (William), Diana Lucas (Diana)[1], and Fred H. Smith, LLC (FHS). Plaintiff, Victoria Smith, brought this action against defendants asserting breach of contract, breach of fiduciary duty, and claims for accounting and dissolution after she inherited an interest in FHS following the death of her late husband, John Smith (John). Plaintiff claimed that defendants improperly attempted to buy out her interest in FHS, and failed to operate FHS in accordance with the business's Operating Agreement. At the time of the agreement, Diana, John, Gary Smith, and James Smith each owned 25% of FHS. FHS owned drilling rights at oil wells located in North Dakota. FHS leased those drilling rights to third parties and paid its members monthly royalties from the profits earned on those leases.

¶ 3     Plaintiff sought a judgment requiring defendants to either accept her as a member of the business and pay her additional amounts for her interest in FHS, or to have FHS dissolved and have its assets sold and distributed. Defendants filed a motion for summary judgment contending, *inter alia*, that plaintiff was a not a member of FHS because she received her interest as a result of a transfer, and that defendants substantially complied with the Operating Agreement such that dissolution was not warranted. The court ultimately granted defendants' motion and plaintiff appealed.

¶ 4     On appeal, plaintiff contends that the court erred in granting defendants' motion for summary judgment where there were genuine issues of material fact regarding defendants' compliance with the Operating Agreement. Plaintiffs maintains that the court erred in finding that defendants presented sufficient evidence to show that they complied with the provisions of the

---

[1]Diana is William's mother.

Operating Agreement, in electing to continue the operation of the business, and in determining the valuation of plaintiff's interest in FHS. Plaintiff asserts that the evidence actually shows that defendants failed to follow the Operating Agreement, but the court improperly shifted the burden to her on defendants' motion for summary judgment. Plaintiff contends that we should reverse the circuit court's entry of summary judgment and remand this matter for further proceedings. For the reasons that follow, we affirm in part and reverse in part the judgment of the circuit court, and we remand for further proceedings.

¶ 5                                   I. BACKGROUND

¶ 6                              A. Complaint and Answer

¶ 7     On February 6, 2019, plaintiff filed a three-count complaint against defendants in the circuit court. In her complaint, plaintiff alleged that FHS was originally formed as "Brouse Delta, LLC" in December 1999 as an Ohio Limited Liability Company. In December 2000, Brouse Delta, LLC changed its name to FHS. At the same time, the members of FHS entered into an Operating Agreement concerning the management and operation of FHS.

¶ 8     In September 2010, William purchased the entire 25% membership interest of James Smith in exchange for $75,000. A month later, William and Diana together jointly purchased Gary Smith's 25% interest in exchange for $78,000. Thus, in October 2010, FHS membership was allocated as: William 37.5%, Diana 37.5%, and John 25%.

¶ 9     In January 2012, William sent a letter to Diana and John advising them that he had "taken responsibility" for FHS, and would now be responsible for making the monthly distributions to Diana and John from the income FHS earned from its leases. William testified at his deposition that this letter was to inform the members that he was now president of FHS after taking over from his father, William Lucas, Sr. (Lucas Sr.).

¶ 10    On June 25, 2016, John died, and designated plaintiff as his sole heir. Thereafter, William sent 25% of the monthly distributions from FHS to plaintiff until April 2017. At that time, William indicated his intention to buyout plaintiff's share of FHS, but plaintiff refused. William asserted that under the Operating Agreement, plaintiff was a transferee, and not a member, and therefore did not have the right to continue receiving monthly distributions from FHS.

¶ 11    William retained an accountant, Chad Elkins, to value plaintiff's 25% interest in FHS. William then sent plaintiff's checks for the amount of her interest, but plaintiff refused to deposit them. Plaintiff then filed the instant action.

¶ 12    In Count 1 of her complaint, plaintiff raised a claim for breach of contract. Plaintiff contended that after John's death, he passed his membership interest in FHS to her. William continued to make monthly distributions to plaintiff, and neither William nor Diana objected to plaintiff's receipt of distributions. Plaintiff also received tax forms from FHS where she was identified as a "member." Nonetheless, in April 2017, William told plaintiff that she was not a member of FHS and intended to buyout her interest. Plaintiff contended that thereafter defendants refused to remit any membership distributions to her in violation of the Operating Agreement. Plaintiff also contended that defendants failed to properly follow the Operating Agreement in both admitting William as a member after he purchased shares from Gary and James Smith and in installing him as president of FHS.

¶ 13    Plaintiff next raised a claim for breach of fiduciary duty contending that defendants owed her a "heightened fiduciary duty" as fellow members of FHS. Plaintiff alleged that defendants breached this fiduciary duty when they suggested that she was not a member of FHS and attempted to purchase her shares in FHS for below market value. After plaintiff refused defendants' offer, plaintiff asserted that defendants then amended the Operating Agreement to deter plaintiff from

filing suit against them by requiring any member or heir who filed suit against FHS to be responsible for FHS's legal fees.

¶ 14    Finally, plaintiff raised a claim for an accounting and dissolution of FHS. Plaintiff raised this as an alternative theory of recovery alleging that the Operating Agreement provided that the death of a member is a dissolution event for the business. After the death of John, under the Operating Agreement, the remaining members of FHS had 90 days to unanimously elect to continue the business of FHS to avoid dissolution. Plaintiff contended that defendants failed to do so, and, as a result, plaintiff was entitled to an accounting of FHS's assets and liabilities, a winding up of FHS's affairs, and a distribution of FHS's assets in accordance with her membership share.

¶ 15    Defendants filed an answer and affirmative defenses to plaintiff's complaint. In their affirmative defenses, defendants contended that in January 2012, William became president and manager of FHS and "[a]ll members [of FHS] agreed to William's assumption of position and responsibilities [*sic*] without objection." Defendants contended that after receiving John's will in February 2018, they followed the procedure outlined in the Operating Agreement for the buyout of John's shares, which had been transferred to plaintiff. Defendants alleged that in accordance with that valuation, they issued checks to plaintiff representing the value of John's shares.

¶ 16    Defendants raised the affirmative defense of satisfaction contending that plaintiff had received the full amount owed for her interest and was owed nothing further. Defendants also raised the affirmative defense of compliance asserting that they had fully complied with the Operating Agreement including remitting distributions to plaintiff, performing valuation of "the entity," and remitting payment to plaintiff for her share of interest in FHS. Defendants also maintained that William and Diana were the only existing members of FHS and they "elected to continue doing business at all times relevant including holding regular meetings and making

distributions." Finally, defendants raised the affirmative defense of lack of standing. Defendants contended that when John died, plaintiff became a "transferee" by inheritance of his interest. Defendants asserted that the Operating Agreement provided that a transferee who is not already a member could be admitted as a member only by " 'unanimous consent of the non-transferring members.' " Defendants maintained that Diana and William never voted to make plaintiff a member of FHS. Defendants maintained that plaintiff therefore lacked standing to seek dissolution of FHS as a non-member.

¶ 17                          B. Motion for Summary Judgment

¶ 18    Defendants subsequently filed a motion for summary judgment. In their motion, defendants asserted that plaintiff did not become a member of FHS after John died and passed his interest to plaintiff. Defendants maintained that William and Diana never treated plaintiff as a member and plaintiff never participated in the operation of FHS as a member. Defendants contended that rather than voting to admit plaintiff as a member, William and Diana instead "refused [plaintiff] admission" and always treated her as a transferee rather than a member. Defendants asserted that plaintiff's contention that she became a member of FHS was a conclusory statement without any evidentiary support. Defendants maintained that plaintiff did not vote on any matters, did not participate in meetings, and did not have access to corporate documents or records. Defendants contended that as a transferee, rather than a member, plaintiff was entitled only to receive distributions.

¶ 19    Defendants acknowledged that plaintiff had received tax documents that identified her as a "member," but contended that the tax preparer did not have the authority to make plaintiff a member of FHS simply by mischaracterizing her as one. Defendants submitted a letter from their tax preparer who indicated that the caption identifying plaintiff as a member had been

"autogenerated." Defendants maintained that plaintiff had never taken any actions of a member and had never been treated as a member.

¶ 20    Defendants also contended that their buyout of plaintiff's interest was proper based on the procedure outlined in the Operating Agreement. FHS, through William, engaged Elkins, a certified public accountant (CPA), who prepared a valuation for plaintiff's interest. FHS then sent plaintiff checks totaling the amount of her interest based on the valuation.

¶ 21    Defendants further asserted that FHS continually remained in business after John's death. Defendants contended that the then-remaining members, William and Diana, elected to continue the business "by discussion during a telephone meeting." Defendants asserted plaintiff waived her right to force dissolution of FHS by accepting distribution checks for a year after John's death. Defendants also contended that William's membership and position as president of FHS were uncontestable. Defendants maintained that all of the members consented to William's membership and his assumption of the role of president. Finally, defendants contended that FHS was entitled to legal fees based on recent amendments to the Operating Agreement providing that any member or heir who brought an action against FHS would be required to pay FHS's legal fees.

¶ 22    In plaintiff's response to defendants' motion, she contended that under the terms of the Operating Agreement, William never became a member of FHS. Plaintiff asserted that the Operating Agreement provided that there had to be a written record of William's purchase of his shares and a written record of the unanimous vote of the members to approve William as a member. Plaintiff maintained that no such written record existed. Plaintiff contended that if William was a member of FHS without formally following the procedures in the Operating Agreement, then plaintiff should also be considered a member. In the alternative, plaintiff asserted that if the court strictly applied the terms of the Operating Agreement, then FHS should be dissolved because the

remaining members failed to record a written unanimous vote to continue the business within 90 days of John's death.

¶ 23    Plaintiff also contended that the valuation of FHS violated the terms of the Operating Agreement because William retained an independent accountant to conduct the valuation rather than using FHS's accountant as the Operating Agreement specified. Plaintiff further asserted that the accountant William retained to conduct the valuation, Elkins, did not have experience in the area of mineral rights and appeared to be directed by William rather than working independently. Plaintiff also noted that Elkins failed to engage the assistance of a consultant in determining the valuation, which was required by the Operating Agreement.

¶ 24    Finally, plaintiff contended that the July 2017 amendments had no legal effect because she was a member at the time of the amendments and did not consent to the amendments.

¶ 25                                    C. The Court's Ruling

¶ 26    The court initially entered an order granting defendants' motion for summary judgment finding that plaintiff was not a member of FHS, that the Operating Agreement was unambiguous, and that defendants complied with the Operating Agreement in buying out plaintiff's shares. Plaintiff subsequently filed a motion to "reconsider and for clarification" of the court's order granting summary judgment. In her motion, plaintiff contended that summary judgment was improper because defendants failed to elect to continue the business of FHS within 90 days of John's death. Plaintiff also pointed out that the court relied exclusively on defendants' statement of facts from their motion for summary judgment, but plaintiff presented a different set of facts in her complaint. Plaintiff maintained that the court's order therefore relied on unsupported or disputed factual assertions. Finally, plaintiff asserted that the court misconstrued her argument regarding the valuation of her share of FHS. Plaintiff did not contend that the valuation was too

low, but instead asserted that the accountant retained by William to conduct the valuation was not qualified to perform the valuation and that the valuation did not comply with the terms of the Operating Agreement.

¶ 27     After further briefing on plaintiff's motion, the court withdrew its initial summary judgment order and held it for naught. On the same day, the court entered a second order granting defendants' motion for summary judgment.

¶ 28     In its order, the court found that under the Operating Agreement, plaintiff was a transferee of John's interest, but did not become a member of FHS because the remaining members did not unanimously consent to her membership. The court also found that there was evidence to suggest that the members of FHS unanimously voted William as president after Lucas Sr. stepped down. The court noted that plaintiff denied that William became president, but she failed to offer any contradictory evidence. The court determined that after John's death, FHS did not stop conducting business, and William continued making distributions to interest holders, including to plaintiff. The court also observed that at his deposition, William testified that he and Diana agreed to continue to operate FHS for the foreseeable future.

¶ 29     The court further found that plaintiff had failed to present evidence to dispute defendants' assertions that she was not a member of FHS. The court noted that there was no evidence of a vote and neither William nor Diana ever told plaintiff that she was a member. Plaintiff also never participated in any meetings or votes of FHS. The court found that the issue of whether plaintiff was admitted as a member of FHS was the "crux" of her claims because the Operating Agreement dictates the rights and obligations of FHS members. The court observed that the Operating Agreement provided that a person who acquired a member's interest but is not admitted as a member does not have the same entitlements or rights of a member. The court noted that neither

William nor Diana ever explicitly told plaintiff that she was a member. The court found that "[p]laintiff cannot refute Defendants' assertion that both William and Diana affirmatively declined [plaintiff's] membership." The court concluded that plaintiff could not show that she was admitted as a member of FHS.

¶ 30    The court also found that although William and Diana failed to take an explicit vote after John's death to continue the operation of FHS as required by the Operating Agreement, "FHS did in fact continue business." The court found that plaintiff did not offer sufficient evidence to rebut William's testimony that he and Diana elected to continue business after learning about John's death. The court found that it was undisputed that FHS never ceased operations after John's death. The court concluded that there was therefore no genuine issue as to whether defendants complied with the Operating Agreement before buying out plaintiff's interest.

¶ 31    The court further found that William complied with the FHS Operating Agreement when he hired a new accountant to conduct the valuation of plaintiff's interest. The court also determined that despite plaintiff's assertions that Elkins was not qualified to perform the valuation, a letter Elkins submitted to the court detailed his experience and his process for determining the valuation. The court therefore found that Elkins possessed the necessary experience and plaintiff failed to put forth sufficient evidence to contradict Elkins' experience or his valuation. The court therefore granted defendants' motion for summary judgment. Plaintiff now appeals.

¶ 32                                              II. ANALYSIS

¶ 33    On appeal, plaintiff contends that the court erred in granting defendants' motion for summary judgment. Plaintiff maintains that there were critical issues of material fact still in dispute at the time defendants filed their motion. Plaintiff asserts that the evidence shows that defendants failed to properly follow the Operating Agreement in buying out plaintiff's interest in FHS.

Plaintiff also contends that defendants failed to abide by the terms of the Operating Agreement in order to avoid dissolution of FHS.

¶ 34                                    A. Summary Judgment

¶ 35    Summary judgment is appropriate when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014). "The purpose of summary judgment is not to try an issue of fact but to determine whether one exists." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993). "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). We review *de novo* a circuit court's ruling on a motion for summary judgment. *Espinoza v. Elgin, Joliet and Eastern Ry Co.*, 165 Ill. 2d 107, 113 (1995).

¶ 36              B. The Operating Agreement is Governed by the Laws of Ohio

¶ 37    Section 12.4 of the Operating Agreement provides that the laws of the State of Ohio govern the Operating Agreement. However, as the circuit court recognized, Ohio law does not differ substantively from Illinois law on the issue of contract interpretation. "The primary goal of contract interpretation is to give effect to the intent of the parties." *Richard W. McCarthy Trust v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 535 (2011).

¶ 38              C. William was a Member and President of FHS

¶ 39    Although plaintiff does not raise a specific claim relating to Williams' membership in FHS, an issuing underlying her claims against defendants and an issue she raised in the trial court was

that William was not properly accepted as a member of FHS and was not properly elected president of FHS. William was not one of the original members of FHS and purchased his interest from former members. Specifically, in September 2010, William purchased the 25% membership interest of James Smith in exchange for $75,000. A month later, William and Diana together jointly purchased Gary Smith's 25% interest in exchange for $78,000. Plaintiff contends, however, that merely purchasing James and Gary Smith's membership interest did not make William a member of FHS.

¶ 40    Plaintiff points out that section 8.4 of the Operating Agreement requires transfers of membership interest to be in writing, and that under section 1.15, members of FHS have to agree in writing to be bound by the terms of the Operating Agreement.[2] Section 8.1.6 of the Operating Agreement governs the admission of a non-member who receives by transfer a member's investment share. That section provides in pertinent part that: "The admission of a transferee, who is not already a Member, as a substitute Member shall be subject to the unanimous consent of the non-transferring Members, which consent may be withheld for any reason."

¶ 41    William acknowledged at his deposition that that he did not follow the writing requirements set forth in the Operating Agreement. He testified, however, that his father, Lucas Sr., who was president of FHS at the time William purchased his membership interest, spoke to the other members, and received their unanimous consent to make William a member. Lucas Sr. submitted an affidavit in which he averred that after William purchased James Smith's membership interest, William was "unanimously voted into the LLC" in September 2010. Plaintiff does not offer any evidence to rebut this testimony or Lucas Sr.'s affidavit.

_____

[2]We observe that plaintiff does not allege that she agreed in writing to be bound by the terms of the Operating Agreement despite her claim that she was a member.

¶ 42    Similarly, William testified that in 2011, Lucas Sr. asked William to take over his responsibilities as president of FHS. William testified that after he agreed, Lucas Sr. contacted all of the members and everyone was "enthusiastic." Similarly, Lucas Sr. averred in his affidavit that he approached William about taking over as president. Lucas Sr. spoke with John and Diana and they "were excited to have [William] take over." Lucas Sr. averred that William was "unanimously voted to be President of the LLC" in December 2011. Plaintiff attached to her complaint a January 2012 letter William sent to John and Diana, the only members of FHS at the time, in which he stated that this was the "first month since I have taken responsibility for the Fred H. Smith LLC." Again, plaintiff did not present any evidence to dispute William's testimony or Lucas Sr.'s affidavit. Her claims that William was not voted a member of FHS and was not voted president of the business are unsupported allegations that are insufficient to withstand summary judgment.

¶ 43                    D. Plaintiff Was Not a Member of FHS

¶ 44    We will next address the trial court's finding that plaintiff was not a member of FHS. As she did before the trial court, plaintiff acknowledges that she was not admitted as a member under the terms of the Operating Agreement, but asserts that after John's death, defendants treated her as though she were a member. Plaintiff contends that defendants sent her royalty checks and tax documents related to FHS. Plaintiff maintains that under the Operating Agreement, only members were entitled to receive the tax documentation that defendants sent to her.

¶ 45    As noted, section 8.1.6 of the Operating Agreement governs the admission of a non-member who receives by transfer a member's investment share. That section requires the unanimous consent of the non-transferring members to admit a new member as a substitute member. That section further provides that:

"A Person who acquires all or a portion of a Member's Interest but is not admitted as a substituted Member, or who acquired only the rights to distributions of cash from the Company, shall be entitled to only the allocations and distributions with respect to such Interest in accordance with this Agreement, but shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the records or books of the Company, and shall not have any other rights of a Member under the Act or the Agreement."

It is undisputed that upon John's death, his interest in FHS was transferred to plaintiff. Plaintiff, as a transferee, would thus be subject to the admission procedure in section 8.1.6 of the Operating Agreement.

¶ 46    Defendants deny that plaintiff was admitted as a member by the unanimous consent of William and Diana, the two remaining members at the time of John's death. Plaintiff does not dispute defendants' position, but contends that defendants treated her as a member because she was provided with the same financial information that defendants sent to John when he was a member, including copies of 1099 forms from FHS business partners and K-1 tax forms. Plaintiff points out that under the Operating Agreement, a non-member would not be entitled to receive these documents.

¶ 47    Despite plaintiff's assertions to the contrary, the undisputed evidence shows that plaintiff was not admitted as a member of FHS. Neither William nor Diana told plaintiff that she was a member and plaintiff does not dispute that they did not vote to make her a member. Plaintiff's receipt of tax documents does not serve to make her a member under the Operating Agreement. Plaintiff did not participate in meetings or inspect corporate records or books. Instead, she simply received her monthly distributions, which was her right under the Operating Agreement.

¶ 48    Plaintiff contends, however, that under Ohio Law, she was entitled to all the same rights in FHS as John because she was the executor of his estate. Plaintiff relies on Ohio case law that holds that "[a]n executor of the estate of a deceased member of a limited liability company has all rights that the member had prior to death, for the limited purpose of settling the member's estate or administering his property." *Holdeman v. Epperson*, 2006-Ohio-6209, ¶ 23. We observe that although plaintiff raised this argument in the trial court in her response to defendants' motion for summary judgment, she did not raise it in her opening brief before this court. Instead, she raised it for the first time in her reply brief. "[A]n appellant's arguments must be made in the appellant's opening brief and cannot be raised for the first time in the appellate court by a reply brief." *In re Marriage of Winter*, 2013 IL App (1st) 112836, ¶ 29 (citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)). Nonetheless, the authority cited by plaintiff suggests that she, as the executor, would inherent John's membership interest for the "limited purpose of settling the member's estate or administering his property." *Holdeman*, 2006-Ohio-6209, ¶ 23. This language does not purport to usurp the procedures outlined in the Operating Agreement for the admittance of a substitute member. Rather, it merely gives plaintiff the limited authority to settle and administer John's property, including his membership share. We therefore find that the trial court did not err in finding on summary judgment that plaintiff was not a member of FHS.

¶ 49         E. A Question of Fact Exists as to the Valuation of Plaintiff's Interest

¶ 50    Plaintiff next contends that the court erred in finding that defendants complied with the Operating Agreement concerning the buyout of her interest in FHS. Plaintiff asserts that the Operating Agreement mandates that valuations should be done by the company accountant, and that the independent accountant, Elkins, retained by William did not have any experience in valuing mineral rights. Plaintiff also contends that Elkins did not retain the services of a consultant

to assist him in valuing plaintiff's share. Plaintiff maintains that Elkins' qualifications represented a factual question that should not have been resolved on summary judgment because it concerned whether his valuation was legitimate.

¶ 51    First, we recognize that the Operating Agreement provides that for the purposes of valuing the interest of a removed member, "[t]he accounting firm for the Company (the "Accountant") will determine the net value of the Company." William testified at his deposition that he asked the company's accountant to perform the valuation, but she told him that she could not because of her "employment agreement with H&R Block." William testified that he therefore conducted a "rather extensive search" for CPAs who knew anything about mineral rights. William found Elkins who had an office near William's home in Chicago. William testified Elkins was from Texas and his family owned mineral rights. William testified that he had a phone conversation with Elkins where he was "extremely impressed" with Elkins' knowledge. After Elkins performed the valuation, William hired Elkins to be FHS's new company accountant.

¶ 52    In support of her contentions that Elkins was not qualified to value FHS's mineral rights and that Elkins was working under the direction of William to provide a low valuation for plaintiff's share, plaintiff relies on a series of emails between William and Elkins. The emails begin with William reaching out to Elkins informing him that William owned part of an LLC that collected royalty income from mineral rights. William informed Elkins that under the Operating Agreement, he was required to have a CPA value the shares of the business. Elkins responded that he would like to help, but that he was "honestly not very experienced with this type of accounting work (my specialty is tax preparing, planning, analyzing, etc.)." Elkins continued, however, that he could likely "grasp" the task "without having done the type of assignment before."

¶ 53     Plaintiff asserts that in subsequent emails, William appeared to direct Elkins asking him to remove or edit certain portions of his valuation. For example, Elkins had apparently recently done a valuation for a restaurant. William asked Elkins to not mention that the business was a restaurant. William also asked Elkins to change sections of the valuation letter. Based on the emails, Elkins originally wrote: "I have over 12 years of experience in reviewing and evaluating financial statements, including several audit and tax-related engagements for various public and private institutions. I've submitted valuation opinions in the past, most recently for prospective buyers of a restaurant in the process of selling its business." William asked Elkins to change that section to: "I have over 12 years of experience in reviewing and evaluating financial statements, and submitting opinions for valuing businesses." Plaintiff maintains that these emails show that Elkins did not have the necessary experience to conduct the valuation, that William and Elkins attempted to improperly inflate his qualifications, and that Elkins was being directed by William rather than working independently.

¶ 54     William testified at his deposition that he believed Elkins was "confused" about what William wanted based on his initial email, and that Elkins' response to the email was "a little odd." Williams testified that he later had a phone conversation with Elkins and he was "extremely impressed with his knowledge." William testified that he would not have hired Elkins if Elkins told him that he was not familiar with mineral rights. William did not know if Elkins spoke with a consultant to perform the valuation, but knew that he did research on the internet.

¶ 55     Elkins submitted two letters relating to his valuation. One detailing the valuation (Valuation Letter), and a second "confirm[ing] [his] opinion regarding the value of" plaintiff's share (Confirmation Letter). In the Valuation Letter, Elkins stated that there were two methods that can be used to value mineral rights. The most common method is the "income multiplier"

method. Elkins stated that the multiplier to be used for this formula depended on several factors including the "acreage, recent production, oil prices, and (most importantly) the fair market value of similar properties." Elkins then determined the multiplier, and, using the total amount FHS had received in royalties during the previous 12 months, valued plaintiff's 25% share at $54,065.31.

¶ 56    In the Confirmation Letter, Elkins stated that his experience included "analyzing oil and mineral rights, which I performed regularly during my time as a CPA working in west Texas." In determining FHS's valuation, Elkins stated that he considered different valuation methods, but determined that the income multiplier method "was the optimal technique to use in this instance."

¶ 57    We find that the evidence presented shows that there was at least a question of fact as to Elkins' qualifications and his valuation to preclude the entry of summary judgment on this issue. The evidence presented raises a factual question as to Elkins' experience and whether he changed portions of his valuation at the direction of William. The evidence shows that in 2010, William purchased the 25% membership share of James Smith for $75,000. William testified at his deposition that this "was just a number we negotiated." William testified that in determining the amount, he considered the income that the business had been producing. A month later, William and Diana together purchased Gary Smith's 25% interest for $78,000. William testified at his deposition that they agreed to purchase Gary Smith's interest for $78,000 instead of the same $75,000 paid for James Smith's interest because Gary Smith was in poor health and it "wasn't worth the family squabble." Nonetheless, in 2016, six years later, Elkins valued plaintiff's 25% interest at $54,065.31. Defendants did not present any evidence to explain this nearly 35% decrease in valuation. Thus, there are factual issues stemming from Elkins' valuation of plaintiff's share.

¶ 58    A further factual issue is whether Elkins was required to employ the assistance of a consultant in determining the valuation, and whether his valuation is deficient based on his failure

to do so. The Operating Agreement provides that in determining the valuation of the Company: "The Accountant should utilize persons knowledgeable in the valuation of the type of businesses operated by the Company in determining such value." Defendants appear to concede that Elkins did not retain a consultant, but argue that the use of the word "should" in the Operating Agreement suggests that the use of a consultant is discretionary. These are questions of fact that should not have been decided on a motion for summary judgment.

¶ 59                    F. FHS Properly Elected to Continue Operation

¶ 60    Plaintiff finally contends that FHS should be dissolved because defendants failed to comply with the Operating Agreement regarding the continuation of the business following the death of a member. Plaintiff maintains that the Operating Agreement provides that following the death of a member, the remaining members had 90 days to vote to continue the business, but defendants failed to do so.

¶ 61    Initially, we observe that having found that plaintiff was not a member of FHS, it would be inequitable for the court to permit her to force the involuntary dissolution of the business when the remaining members of the business unanimously agreed to continue the business. Nonetheless, we observe that section 10.2 of the Operating Agreement provides that following the death of an FHS member:

> "The Company shall not be dissolved if, within ninety (90) days thereafter, the remaining Members other than the Member associated with the event giving rise to the dissolution, elect to continue the business of the Company."

The only remaining members of the business at the time of John's death were William and Diana. William testified at his deposition that the business rarely had formal meetings because each of the members lived in different states. Instead, they would often vote on matters individually over

the telephone. He testified at his deposition that after John's death, he and Diana did not have a "specific vote," but "had an agreement that the operations would continue." William testified that this was an "implicit agreement," because they were discussing how the business would function in the event of Diana's death. William testified that this amounted to an acknowledgement that the business would still be functioning as opposed to "being broken up."

¶ 62 Plaintiff claims that this "implicit agreement" was insufficient under the Operating Agreement to avoid dissolution of the business. However, as the circuit court recognized, the clearest evidence of the member's intent are their actions. After John's death, the business continued operating. William, as president, collected royalties and distributed monthly payments to members, the business secured a new accountant, and the business continued on as usual. Plaintiff has not presented any evidence to contradict defendants' assertion that William and Diana elected to continue FHS's business.

¶ 63 Plaintiff relies on *Dudley v. Dudley*, 2009-Ohio-1166; however, we find the circumstances in that case distinguishable from those in the case at bar. In *Dudley*, the plaintiffs and defendants signed an operating agreement and entered into a farming business. *Id.* ¶ 2. Three years later, one of the plaintiffs withdrew his membership from the company. *Id.* ¶ 3. Thereafter, another plaintiff voted against continuing the operation of the company. *Id.* As a result of the vote, the remaining members were unable to obtain the unanimous vote required by the operating agreement to continue the business. *Id.* In response, a majority of the remaining members voted to amend the Operating Agreement to " 'allow a majority of the remaining Members, after the withdrawal of a Member, to vote to continue operation of the Company.' " *Id.* A majority of the remaining members then voted to continue the business. *Id.* The plaintiffs filed suit seeking, among other things, a declaratory judgment requiring the company to dissolve because the remaining members

were unable to obtain the unanimous vote required to continue the business. *Id.* ¶ 4. The court granted partial summary judgment in favor of the plaintiffs and the defendants appealed. *Id.* ¶¶ 4-5.

¶ 64 On appeal, the defendants argued that a unanimous vote was not required to avoid dissolution of the company after one of the members withdrew because a majority of the remaining members voted to amend the operating agreement to provide for only a majority vote to continue the company. *Id.* ¶ 17. After reviewing the operating agreement, the court found that the amendment could not supersede the original intent of the agreement that the withdrawal of a member would trigger a dissolution unless the remaining members voted unanimously voted to continue the company. *Id.* The court found that any other interpretation would render the dissolution provision of the operating agreement meaningless, and would severely prejudice any member who wanted to withdraw from the company. *Id.* The court concluded that "because the language used by the parties is clear and unambiguous in regard to the dissolution of the Company, we find that the July 15 amendment cannot supersede and defeat the intent of the parties found in Item VII of the original Operating Agreement." *Id.*

¶ 65 We find the circumstances in the case at bar distinguishable from those in *Dudley*. Here, after the dissolution event of John's death, the remaining members of FHS unanimously agreed to continue operation of the business. In contrast, in *Dudley*, the remaining members were unable to secure the unanimous approval of the remaining members to continue the business, and attempted to amend the operating agreement to remove the unanimous consent requirement. William and Diana did not attempt to circumvent the terms of the Operating Agreement here. Rather, the original intent of the Operating Agreement clearly shows that if the remaining members unanimously elect to continue the business within 90 days of the dissolution event, then the

business will not be dissolved. William and Diana's unanimous intent to continue the business is evidenced by their conversation following John's death as detailed in William's deposition testimony and the fact that the business did continue, and neither William nor Diana withheld their consent with the intention of seeking dissolution of the business. Not even plaintiff, who alleged that she was a member following John's death, sought dissolution of the business within 90 days of John's death, but instead continued receiving monthly royalty checks. Plaintiff sought dissolution more than a year later only after defendants stated their intent to buyout her interest. Plaintiff has thus failed to present any evidence to create a genuine issue of fact with regard to this issue.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm in part and reverse in part the judgment of the circuit court of Cook County, and we remand for further proceedings consistent with this order.

¶ 68    Affirmed in part and reversed in part.

¶ 69    Cause remanded.