2023 IL App (2d) 220428-U
No. 2-22-0428
Order filed November 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRIAN NEFF, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 20-L-159 |
| | ) | |
| ADVOCATE CONDELL MEDICAL | ) | |
| CENTER and MIDTOWN HEALTH, LLC, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Advocate Condell Medical Center, | ) | David P. Brodsky, |
| Defendant-Appellee). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Summary judgment for defendant on plaintiff's negligence and premises liability claims was proper where no genuine issue of material fact existed as to whether defendant had actual or constructive notice of the dangerous conditions—a pothole and a burnt-out overhead light—that allegedly caused plaintiff to fall while walking in defendant's parking lot.

¶ 2    Plaintiff, Brian Neff, was employed as a nurse by defendant, Advocate Condell Medical Center.  On the evening of November 18, 2019, he was injured when he left work, walked to his car, and fell into a pothole in a parking lot that defendant owned.  He received workers'

compensation benefits until June 2020, when defendant informed him that his benefits would cease because he "undertook a personal task after finishing work and at a later time returned to the parking lot at work where he fell." Plaintiff never challenged defendant's decision. Instead, plaintiff sued defendant and Midtown Health, LLC (Midtown), which managed a health club adjacent to the parking lot where plaintiff fell. Plaintiff's counts against defendant concerned negligence and premises liability. Plaintiff alleged that defendant failed to exercise reasonable care to ensure that there were no defects on its premises, such as the pothole into which he fell, that could potentially harm others. Plaintiff also alleged that defendant failed to exercise reasonable care to ensure that the lighting on its premises, including the lighting in the area where he fell, was operational. Defendant and Midtown moved for summary judgment (735 ILCS 5/2-1005(b) (West 2018)). Defendant argued, among other things, that (1) it had no notice of any defects in the parking lot and (2) plaintiff could not maintain any action against it, as the exclusive remedy provision of the Workers' Compensation Act (Act) (820 ILCS 305/5(a) (West 2018)) provided plaintiff with his sole recourse. The trial court granted defendant's and Midtown's motions for summary judgment. Plaintiff timely appealed from only the order granting defendant summary judgment. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Pleadings

¶ 5                 1. First Amended Complaint and Motion for Summary Judgment

¶ 6     In his first amended complaint, which he brought against defendant and Midtown, plaintiff alleged that defendant owned and operated the parking lot adjacent to the Centre Club, the health club managed by Midtown. He claimed that defendant had a duty to exercise reasonable care to maintain that lot. He alleged in both his negligence and premises liability counts against defendant

that defendant breached that duty when it "[c]aused and/or allowed a hole, depression and/or similar defect to exist for an unreasonable time on the [p]remises, when [d]efendant knew or should have known of the existence thereof, and the defective, dangerous and hazardous condition resulting therefrom." Plaintiff also alleged that defendant "[f]ailed to provide sufficient lighting on the [p]remises when reasonable and ordinary care would require same" and "[f]ailed to maintain lighting fixtures or lamps on the [p]remises when reasonable and ordinary care would require same." Plaintiff alleged that as a direct and proximate result of defendant's acts or omissions, he suffered personal injuries. Plaintiff sought $50,001 in damages.

¶ 7 Both defendant and Midtown moved for summary judgment. Defendant argued in its motion that plaintiff was defendant's employee and that he was injured in the scope of his employment. Thus, the exclusive remedy provision of the Act provided plaintiff with his only recourse. Defendant also argued that it was entitled to summary judgment because it had no actual or constructive notice of any dangerous condition in the parking lot before plaintiff fell.

¶ 8 Various documents were attached to defendant's motion for summary judgment. Included in the attachments were plaintiff's deposition; the deposition of Ryan Ollie, defendant's manager for facilities operations; and the deposition of Kimberly Anne Smith, the manager of the Centre Club. The following facts were taken from those depositions and, where referenced, other documents contained in the record.

¶ 9                                a. Plaintiff's Deposition

¶ 10 Plaintiff testified that, on November 18, 2019, he worked a noon to 8:30 p.m. shift for defendant. When he arrived at work, he parked in the lot adjacent to the Centre Club. This lot was part of defendant's hospital campus and was open to the public. Although defendant had employee parking lots on its campus, those lots were usually full before plaintiff arrived at work

to start his shift. Thus, he parked "daily" or "regularly" in the lot adjacent to the Centre Club. Although plaintiff would sometimes go to the Centre Club before or after work, the main reason he parked in the lot adjacent to the Centre Club on November 18, 2019, was to go to work.

¶ 11    When plaintiff left work at the hospital on November 18, 2019, he was "off the clock." As he was walking to his car parked in the lot adjacent to the Centre Club, one of the lights in that lot went out. Although plaintiff could not say whether there were other lights out in the parking lot, he recalled that it was dark in the lot. Plaintiff "look[ed] back over [his] left shoulder at [the light that went out] and [saw] like the glow of the light, of the actual like filament type area as it was still glowing, but there wasn't really normal light coming out of it." "[T]he light going out *** distract[ed plaintiff] from where [he was] walking." Plaintiff explained that the light malfunctioning "caught [him] off guard and by surprise." Plaintiff "then [took] a step or two, maybe five, *** and misstepp[ed] directly into or along the edge of the pothole in the lot." "[B]efore the time that [he] fell, [plaintiff] did not see the pothole at any point in time." He "made no observation or any determination that that pothole existed at any time that day" before he fell. Because of the fall, plaintiff suffered injuries to his left foot and ankle, both thumbs, and both wrists.

¶ 12    Plaintiff testified that he had not gone to the Centre Club between leaving work and falling into the pothole. Rather, "from the time [he] left work until the time [he] fell, [he] had not done anything in between that time" other than "[j]ust walking to [his] car." Plaintiff could not remember whether, when he got to his car, he intended to drive home or retrieve his gym bag from his car and go exercise at the Centre Club.

¶ 13    After he fell, plaintiff went into the Centre Club and told an employee there what had happened. Plaintiff refused treatment that night. He left the Centre Club, walked to his car, and

drove home.  The next day, plaintiff reported the incident because his supervisor told him to do so.

¶ 14    Shortly after he fell, plaintiff noticed that "there were cones in multiple locations across the parking lot to warn people there were potholes, and shortly thereafter they were repaired."  He was shown photographs of two potholes, each one of which was marked with a traffic sawhorse and/or cone.  Plaintiff could not recall if either of these potholes depicted in the photographs was the one he fell into.  However, he recalled that the pothole he fell into was repaired sometime after he fell.  In another photograph, he identified the pothole he fell into.  This photograph was taken from the west, down the line of an east-west row of parking spaces bordered on the north by a sidewalk.  The pothole was toward the rear of one of the parking spaces.  To the east, beyond the row of parking spaces, was the Centre Club.  The hospital building was to the west and outside of what the photograph depicted.  A light pole was mounted on the sidewalk in front of the parking space that had the pothole.  The pole was approximately one car length from the pothole.  Although plaintiff could not remember if this was the light that was malfunctioning when he fell, he stated in the incident report he filed with defendant the day after he fell that "a light went out above [him]."

¶ 15    Plaintiff stated during his deposition that he filed a worker's compensation claim in relation to his fall.  Plaintiff said that the claim was denied "because they said [he] went to the Centre Club, exercised, and left the Centre Club *** when [he] got hurt."  Plaintiff "believe[d] that's what they said."  When asked who told plaintiff his claim was denied, he said, "[I]t could have been human resources or someone involved in the human resource department, whether it be disability or the initial workman's comp people, or it could have been the third[-]party workers' compensation

person. I don't recall." Plaintiff was also asked if he "pursue[d the claim] any further after it was denied." Plaintiff replied that he "[t]ried to understand why."

¶ 16    In the record is a June 15, 2020, e-mail from defendant's attorney to plaintiff's attorney, explaining that defendant had denied plaintiff's workers' compensation claim "because [plaintiff] undertook a personal task after finishing work and at a later time returned to the parking lot at work where he fell." In the e-mail, defense counsel asked "to see what medical treatment [plaintiff] ha[d] undergone and if he ha[d] a compromise settlement position for [defendant]." Nothing in the record indicated whether plaintiff responded to this e-mail.

¶ 17                    b. Ollie's Deposition

¶ 18    Ollie indicated that he has degrees in energy engineering and mechanical engineering. As defendant's facilities manager, Ollie was responsible for hiring companies to fix issues with defendant's premises. Although Ollie would "walk the outside campus" weekly, he was "not required to walk the parking lots." Other departments, such as the public safety office, patrolled the grounds on a daily basis.

¶ 19    Ollie stated that defendant was responsible for maintaining the exterior of the Centre Club. According to the lease agreement defendant had with the Centre Club, which was referenced during Ollie's deposition, defendant was required to " 'make all arrangements necessary to ensure adequate and reasonable ingress to and egress from the [club] for Centre's staff at all times and for Centre's members and guests at all times.' " This included the pavement and lighting in the parking lot adjacent to the Centre Club. Although defendant's facilities team, defendant's public safety department, and Midtown worked together, defendant was "ultimately *** responsible" "for overseeing the parking lots and the maintenance of the parking lots of the Centre Club."

¶ 20 From August to October 2019, defendant hired a paving company to do "[g]rounds improvements." This included "seal coating, crack filling, [and] normal stuff that [one would] do on a campus of this size seasonally." It also included pothole-filling that started in October and finished in December 2019. However, defendant "did not have a preventative maintenance contract *** for parking lot maintenance as of November 2019 whereby [a contractor] would come on some set schedule to perform parking lot inspections." Likewise, "with respect to the lighting in the parking lots back in *** November 2019, [there] was [no] preventative maintenance contract in place for any of the outside or exterior lights on [defendant's] campus." Rather, defendant fixed problems on its campus when it became aware of them. Ollie explained that "if someone alert[ed] [defendant] that there [was] an issue, the issue [was] addressed." Thus, "it really [was] a system of alerting [defendant] when there[ was] an issue."

¶ 21 When defendant was notified about problems, defendant hired contractors to fix them. Defendant hired a company to repair potholes on its premises on an "as needed but at a minimum annually" basis. Concerning the lighting in the parking lot of the Centre Club, Ollie explained that there were two components to the lighting system, *i.e.*, the lights and their photosensors. The lights came on when they sensed darkness, stayed on while it was dark, and turned off when they sensed daylight. Because the lights worked on photosensors, the photosensors "were checked every evening *** in a sense." Ollie could not recall when the contractor defendant hired to fix electrical issues was last on the premises to make repairs. However, Ollie indicated that "there was [*sic*] no electrical problems to [his] knowledge [on] November 18, 2019" in the Centre Club parking lot. Ollie did not remember contacting a contractor about the lights in the parking lot after plaintiff fell. He acknowledged, however, that sometime after November 18, 2019, "someone from the

Centre Club did alert [defendant] that there might have been a light that was burnt out in that parking lot."

¶ 22 Plaintiff's counsel then asked Ollie to look for, and provide defense counsel with, any documents indicating whether a contractor came out before November 18, 2019, to repair the lights in the parking lot. Defense counsel assured that "[i]f [defendant had] any such documents, [counsel would] check for them and produce them." (The record does not show that defendant ever produced any such documents, and plaintiff filed no motion to compel.) Ollie agreed that "[i]f there [was] no record of any electrical contractor coming out to repair a single malfunctioning light in the Centre Club parking lot," then "it [would] be reasonable to conclude that someone from [defendant's f]acilities [department or the Centre Club] went out and looked at that light and determined that it was not malfunctioning." Also, at plaintiff's counsel's request, Ollie agreed to look for, and provide defense counsel with, any invoices for lightbulbs. (The record does not show that defendant ever produced any such invoices, and plaintiff filed no motion to compel.)

¶ 23 Ollie was questioned about e-mails he exchanged with defendant's and Centre Club's managers in late November 2019. One e-mail sent to Ollie on November 26, 2019, was from Denise Daleo, the Centre Club's regional general manager. Daleo relayed that one of defendant's employees fell into a pothole in the parking lot adjacent to the Centre Club and was injured. Daleo stated, " 'We clearly need to get the holes patched,' " and she asked Ollie whether patching the potholes was the Centre Club's or defendant's responsibility. That same day, Ollie responded to Daleo. He copied Lisa Wenzlaff, defendant's leasing manager, and asked Wenzlaff who was responsible for repairing the potholes. Wenzlaff responded that defendant was responsible for " 'all maintenance' " " 'includ[ing] all sidewalks, parking lots, landscaping[,] and improvements per the lease agreements.' "

¶ 24    The next morning, Ollie sent Smith an e-mail, asking her where the pothole was so defendant could fix it. Smith responded the same day, saying, " 'There are [two] and they are on the side closer to the hospital, you can't miss them, they are pretty big!' " Ollie replied that same day, saying " 'Okay, thanks. I have marked them with construction barricades. See attached pictures.' " Ollie copied one of his subordinates and asked him to " 'fill these potholes with cold patch.' "

¶ 25    Ollie testified that Daleo's November 26, 2019, e-mail was "probably the first time [he] was notified of [plaintiff's] incident occurring." Ollie believed that, per his November 27, 2019, e-mail, his subordinate filled the pothole with cold patch. Ollie explained that cold patch is "used to temporarily fill holes[,]" like potholes. Ollie subsequently contacted the contractor that defendant used to fix potholes. The potholes were repaired shortly thereafter. Ollie stated that he "[did not] have any personal knowledge of when any of the depressions or potholes *** formed."

¶ 26    Although Ollie was made aware of the incident report that plaintiff filed with defendant the day after plaintiff fell, he did not receive that report before the e-mails were sent at the end of November 2019. Ollie read the following portion of the incident report out loud during his deposition:

        " 'In summary, on November 19, 2019, [a] Public Safety Officer [(PSO) of defendant's] responded to the Public Safety Office for a slip and fall report that occurred the night before *** at the parking lot of the Center [*sic*] Club.' *** 'On arrival, the PSO spoke with [plaintiff] who related that on November 18th, 2019, at approximately [9:30 p.m.], while leaving work, [plaintiff] was walking to his vehicle in lot CC when a light went out above him and when he looked up, [plaintiff] stepped in a large pothole twisting his ankle and falling to the ground. [Plaintiff] related that [he] reported the incident to the

Center [*sic*] Club at the time, but not to Public Safety due to his ankle not hurting too badly. [Plaintiff] finally related that the following morning, [he] had his ankle and wrist checked by his doctor, finding out that the left ankle was broken, and his right wrist was sprained.' "

¶ 27    Ollie was also questioned about the formation of potholes.  He indicated that it was "unlikely" that defendant could do anything to prevent potholes.  He also stated that "potholes can form for [a] multitude of reasons" and that "[a] pothole can form overnight."  Ollie explained:

"So what happens is there's cracks in the asphalt pavement or whatever surface you have.  Moisture gets inside; and then as temperatures drop, it expands into ice, and then it starts contracting as it cools off and melts.  And over time throughout the seasons, it keeps happening until it weakens the cavity underneath the pavement, and then all it takes sometimes is just a vehicle rolling over it or just naturally occurring it caves in.

So oftentimes you'll be driving around Lake Shore Drive for [example] in Chicago, and you'll drive one evening, and it will be fine; and then the next evening, you'll see all these potholes that formed overnight."

¶ 28                                  c. Smith's Deposition

¶ 29    Smith agreed that defendant was responsible for maintaining the parking lot adjacent to the Centre Club.  She stated that "if [she] saw a huge pothole or something dangerous" in the Centre Club parking lot, "[she] would let [defendant] know," "absolutely."  Likewise, if she saw that the lights in the Centre Club parking lot were malfunctioning, she would notify defendant.  Smith said that Ollie was most likely the person she would contact.

¶ 30    Smith stated that, when she had meetings at the hospital, she typically walked on the sidewalk near the pothole where plaintiff fell.  She was unaware of any pothole or lighting problems in that area prior to November 18, 2019.  She was also unaware of anyone else falling in

the parking lot in the six months before November 18, 2019. She indicated that she would have been aware of any lighting problems in the lot given that she worked Monday through Friday and that, in November 2019, it was dark when she left work. Moreover, she stated that if there was a problem with the lighting before November 18, 2019, "[Centre Club] members would tell [her and her staff] that." Smith agreed that "it [was] fair to assume" that if "no e[-]mail was produced" in which she informed defendant of lighting problems in the parking lot, "such an e-mail was not sent."

¶ 31 Smith stated that, immediately after plaintiff's fall, the Centre Club's manager on duty prepared an accident report. That report provided that the "[s]treet light was out and [plaintiff] tripped on a pothole, was walking between hospital and club." Smith reviewed the report two days later, on November 20, 2019. She signed the report and sent it to Midtown. Smith did not remember sending the report to Ollie or anyone else defendant employed. Smith contacted Daleo when "[plaintiff] came back and told us he broke *** his wrist and broke his ankle." Before Smith e-mailed Ollie about the two large potholes, she went to the parking lot to inspect them because Daleo asked her to do so. Smith "guess[ed]" that she inspected the potholes on November 27, 2019, when she e-mailed Ollie.

¶ 32 2. Response and Reply to Motion for Summary Judgment

¶ 33 In his response to defendant's motion for summary judgment, plaintiff asserted that he initiated a worker's compensation claim after he fell. Defendant paid him temporary total disability (TTD) benefits until approximately June 15, 2020, when it determined that plaintiff was not acting within the scope of his employment when he fell. Plaintiff stated that "[i]n response to [defendant's] denial of [his] worker's compensation claim, [he] filed this action." Plaintiff argued

that, because a question of material fact existed as to whether he was acting within the scope of his employment when he fell, defendant's motion for summary judgment should be denied.

¶ 34     Plaintiff also argued that (1) defendant was estopped from raising the Act's exclusive remedy provision, as it stopped paying plaintiff TTD benefits; and (2) if the Act's exclusive remedy provision applied, the dual capacity doctrine, which is an exception to the Act's exclusive remedy provision, controlled.   Plaintiff elaborated that, under the dual capacity doctrine, "[defendant's] second function as a landlord/lessor of land, or owner of a distinctly separate business, generate[d] obligations unrelated to those flowing from the first, that of a hospital [that employed plaintiff]."   Thus, plaintiff argued that, because defendant acted as both defendant's employer and the landlord of the premises where plaintiff fell, plaintiff could maintain both a worker's compensation claim and a negligence/premises liability suit against defendant.   Plaintiff claimed that, at the very least, there was a question of material fact about whether defendant acted in this dual capacity.

¶ 35     Additionally, plaintiff argued that an issue of material fact existed about whether defendant had actual or constructive notice of the pothole and the lighting issue in the parking lot where he fell.   Citing Ollie's deposition and photographs of the barricades over potholes, plaintiff claimed that "reasonable minds could draw different inferences from the facts, as to whether the pretty big and large cavity/pothole, occurring over time throughout the season[,] was created over [a] sufficient amount of time that [defendant] should have noticed same in the exercise of reasonable care." (Internal quotation marks omitted.)   Plaintiff contended that "[t]his same principle applie[d] to the lights."   Specifically, plaintiff alleged that "reasonable minds could draw different inferences from the facts and the disputed testimony between [plaintiff] and Mr. Ollie regarding the flicking

[*sic*] lights, whether the lights and light sensors were indeed properly operating so as to present a triable material issue precluding summary judgment." (Internal quotation marks omitted.)

¶ 36    In reply, defendant argued that certain facts revealed during the depositions showed that defendant did not have any notice of any defects in the Centre Club's parking lot before plaintiff fell. Specifically, defendant asserted that Ollie, Smith, and plaintiff all indicated that they never saw a pothole in the parking lot of the Centre Club before plaintiff fell, and Ollie explained that depressions in pavement can manifest quickly. Similarly, neither Ollie nor Smith had any prior knowledge of problems with the lighting in the lot, and plaintiff indicated that the lights were operational up until the time that he fell.

¶ 37    Regarding the Act's exclusive remedy provision, defendant noted that plaintiff's estoppel argument was premised solely on defense counsel's June 15, 2020, e-mail to plaintiff's counsel. Defendant claimed that this out-of-court hearsay statement could not create an issue of fact. Defendant also asserted that plaintiff's estoppel claim must fail because defendant's denial of TTD benefits was not a position defendant took in court. Finally, defendant argued that plaintiff's dual capacity argument must fail because defendant's mere ownership of the parking lot did not give defendant a second legal persona.

¶ 38                                B. Trial Court's Ruling

¶ 39    The trial court granted defendant's motion for summary judgment. The court found, regarding the Act's exclusive remedy provision, that the record was not clear whether plaintiff went to his car to leave the premises or if he was going to retrieve his gym bag and go exercise at the Centre Club. "[B]ut, before getting to his car[,] *** he fell." The court theorized that defendant may have stopped paying plaintiff TTD benefits because plaintiff told defendant that "[he] was going to grab [his], you know, bag to go work out." On that view, the court noted, plaintiff "[was]

on a personal errand as opposed to leaving the hospital *** on his way home from work and still on [defendant's] property." The court found that it was "presented with no facts to determine, really other than that testimony, as to which of those scenarios [was] true." Thus, the court determined that it "[did] not have enough evidence here *** to dismiss this [case] pursuant to the exclusive remedy doctrine."

¶ 40 Concerning defendant's notice argument, the court found that "there [was] no dispute that there was no actual notice of any defects in the parking lot." The court also found that there was no constructive notice of any defects because "plaintiff [failed] to establish that the defect was present for a sufficiently long period of time to constitute constructive notice." The court noted that plaintiff did not see any defects at any point prior to his fall even though he walked in the Centre Club parking lot almost daily. Likewise, neither defendant's employees nor Midtown's staff saw or were informed about any problems in the parking lot. Thus, the court determined that "[o]ther than inferences and speculation, there[ was] no evidence as to how long the condition[s] existed prior to [plaintiff's] fall." However, "the evidence that [did] exist, *** appear[ed] to indicate that [any defects were] more of a recent manifestation."

¶ 41 Given all of that, the court "[found] that there was no notice, be it actual or constructive in this case," and, therefore, judgment for defendant was proper.

¶ 42 This timely appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44                                 1. Summary Judgment

¶ 45 At issue in this appeal is whether defendant's motion for summary judgment should have been denied. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018).

> "A defendant moving for summary judgment bears the initial burden of coming forward with competent evidentiary material, which if uncontradicted, entitles him to judgment as a matter of law. [Citation.] A defendant does not need to prove its case or disprove its opponent's case in order to prevail on its motion. A plaintiff, however, must come forth with some evidence that arguably would entitle him to recover at trial in order to survive such a motion. [Citation.]" (Internal quotation marks omitted.) *Caburnay v. Norwegian American Hospital*, 2011 IL App (1st) 101740, ¶ 30.

¶ 46 Summary judgment is a drastic measure and should be granted only if the movant's right to judgment is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). Thus, summary judgment should be denied when a reasonable person could draw divergent inferences from undisputed facts. *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). A reviewing court's function is to determine whether a genuine issue of fact was raised and, if none was raised, whether judgment was proper as a matter of law. *American Family Mutual Insurance Co. v. Page*, 366 Ill. App. 3d 1112, 1115 (2006). In doing so, we construe the evidence strictly against the movant and in the light most favorable to the nonmovant. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). We review *de novo* the entry of summary judgment. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 47 As relevant here, plaintiff's complaint consisted of two counts, *i.e.*, negligence and premises liability. "[W]here a landowner's conduct in creating an unsafe condition precedes the plaintiff's injury, a plaintiff may elect to pursue a negligence claim, a premises liability claim, or both." *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 54. In granting defendant's motion

for summary judgment, the court found that no genuine issue of material fact existed concerning either plaintiff's negligence or premises liability claims. That is, the court determined that plaintiff could not establish all the elements of either claim. See *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1063 (2001) ("If the plaintiff cannot establish an element of [his] cause of action, summary judgment for the defendant is proper."). We must determine whether evidence was presented on all the elements of either claim.

¶ 48 " 'To recover on a negligence claim, the plaintiff must establish the existence of a duty owed by the defendant, a breach of that duty, and an injury proximately resulting from that breach.' " *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 28 (quoting *Pavlik*, 323 Ill. App. 3d at 1063). A premises liability claim is a negligence claim involving a specific duty imposed on a property owner. *Id.* ¶ 29. That is, " '[p]roperty owners have a duty to exercise ordinary care in maintaining their property in a reasonably safe condition.' " *Id.* (quoting *Nguyen v. Lam*, 2017 IL App (1st) 161272, ¶ 20). A property owner breaches that duty when it fails to correct a dangerous condition on the property and (1) the property owner knew of, *i.e.*, had actual notice of, the condition; or (2) the condition existed for "a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the [property owner] had constructive notice of the [dangerous condition]." *Id.*

¶ 49 Here, the trial court granted summary judgment because it found no genuine issue of material fact existed as to whether defendant breached a duty it owed plaintiff. Specifically, the court found no evidence to indicate that defendant had either actual or constructive notice of the pothole or lighting issue in the parking lot adjacent to the Centre Club. We agree.

¶ 50 At oral argument, plaintiff conceded that defendant did not have actual notice of the pothole or the malfunctioning light, and rightfully so. No evidence suggested that defendant knew

anything about either condition before plaintiff fell. Rather, the evidence indicated that the lights were "in a sense" (as Ollie stated) checked daily, and no problems were detected before plaintiff's accident. Neither Ollie nor Smith saw any issues with the lighting or were alerted to any problems by defendant's staff, Centre Club staff, Centre Club members, or anyone else. Likewise, neither Ollie nor Smith saw any potholes in the parking lot before plaintiff fell, and they were not alerted to any issues by defendant's staff, Centre Club staff, Centre Club members, or anyone else.

¶ 51    Additionally, we must conclude that no genuine issue of material fact existed as to whether defendant had constructive notice of the pothole or the malfunctioning light. "Constructive notice can be shown only where the dangerous condition is shown to exist for a sufficient length of time to impute knowledge of its existence to the defendants." *Nguyen*, 2017 IL App (1st) 161272, ¶ 20. As with actual notice, a plaintiff claiming that the defendant had constructive notice of a dangerous condition "must prove that the defendant had timely notice of the specific defect that caused [the plaintiff's] injuries." *Zameer v. City of Chicago*, 2013 IL App (1st) 120198, ¶ 23.

¶ 52    Here, as noted above, no evidence indicated that defendant had actual notice of the pothole or the malfunctioning light. Moreover, no evidence indicated that either the pothole or the malfunctioning light existed for any length of time. Regarding the pothole, Ollie indicated in his deposition that, while the formation of a pothole may take a long time, the manifestation of a pothole can occur quickly. Consistent with that evidence is the fact that no one—not defendant, Ollie, Smith, or anyone else—saw or was informed about the pothole before plaintiff fell. Without some evidence suggesting that the pothole existed before plaintiff fell, we cannot conclude that there is a genuine issue of material fact about whether defendant had constructive notice of the pothole. See *Milevski*, 2018 IL App (1st) 172898, ¶ 30 (finding no genuine issue of material fact existed concerning the defendant's notice of defective flooring because "all of the evidence

suggest[ed] that any defect in the raised flooring was not evident until the time of [the] plaintiff's fall"). Likewise, no evidence suggested that defendant could be charged with knowledge of the malfunctioning light. Rather, the evidence, *i.e.*, plaintiff's deposition testimony, showed that the light malfunctioned as plaintiff was walking to his car, mere seconds before he fell. There was no evidence that the issue with the light existed beforehand, let alone for a "sufficient length of time" to warrant imputing knowledge to defendant. See *Nguyen*, 2017 IL App (1st) 161272, ¶ 20. Again, without evidence suggesting that the light was malfunctioning at some point before plaintiff fell, we cannot conclude that there is a genuine issue of material fact about whether defendant had constructive notice of the light not working. See *Milevski*, 2018 IL App (1st) 172898, ¶ 30.

¶ 53    Plaintiff argues that "the fact that [defendant] could not identify when the potholes were last filled (before, or after, [plaintiff's] fall) *at least* raises enough of a question of material fact to preclude summary judgment [on] constructive notice." (Emphasis in original.) He also claims that "Ollie's description [of how potholes form] is the very essence of the temporal requirement to establish constructive notice, especially if such potholes/cavities in the ground originally manifested themselves as cracks, and, 'over time throughout the season[s]' develop into larger cavities." We disagree. The gradual process Ollie described was not of a crack visibly widening into a pothole, but of expansion and contraction underneath the pavement until the surface collapses to form a pothole. That collapse, according to Ollie, could literally occur overnight. While what Ollie described may have been exaggerated in that the pothole into which plaintiff fell was located in a parking lot and not on a road like Lake Shore Drive that is heavily traveled, Ollie's testimony was the only evidence before the trial court of how the pothole manifested. Plaintiff could have retained an expert to provide another opinion, which may have raised a genuine issue of material fact about whether the pothole existed for a sufficient length of time such that defendant

had constructive knowledge of it. Plaintiff failed to provide such evidence, or indeed *any* evidence, of when the pothole causing his fall became visible. That said, even assuming that the pothole in question gradually formed from a crack, defendant annually hired a paving company to fill cracks and seal coat the pavement. Plaintiff's mere speculation about when the pothole in question manifested is insufficient to raise a genuine issue of material fact sufficient to withstand summary judgment. See *id.* (mere speculation, conjecture, or guess is insufficient to withstand summary judgment).

¶ 54    Plaintiff's arguments regarding the lighting in the parking lot also fail to persuade us that summary judgment should not have been granted. Plaintiff suggests that defendant had constructive notice of the malfunctioning light because, sometime after January 18, 2019, "someone from the Centre Club 'did alert [defendant] that there might have been a light that was burnt out in the parking lot' where [plaintiff] fell." We cannot conclude that the fact that someone may have told defendant about a parking lot light that may have been burnt out at some point, either before or after plaintiff's fall, raises a genuine issue of material fact about whether defendant had constructive notice of a lighting problem that distracted plaintiff before he fell. See *id.* Similarly unavailing is plaintiff's suggestion that Ollie's "indeterminate answers" about producing documents showing when an electrical contractor was out to repair the lights "itself raise[s] questions of material fact as to *** [defendant's] *** notice of the malfunctioning [lights]." At Ollie's deposition, defense counsel unequivocally said that *if* such documents existed, defendant would forward them to plaintiff; the fact that no documents were forwarded suggests that no contractor was out to fix the lights because none of them needed repair. Ollie confirmed as much in his deposition testimony. Moreover, and notably, if plaintiff believed that such documents existed, he could have filed a motion to compel. He failed to do so.

¶ 55    *Zameer* supports our position that summary judgment was proper here because defendant had no notice of either the pothole or the malfunctioning light.  In *Zameer*, the plaintiff sued the defendant municipality after she tripped and fell on a displaced slab of sidewalk and was injured. *Zameer*, 2013 IL App (1st) 120198, ¶ 4.  The defendant moved for summary judgment, arguing that it was immune from liability under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102(a) (West 2010)) because it had no notice of the defect in the sidewalk before the plaintiff fell.  *Zameer*, 2013 IL App (1st) 120198, ¶¶ 5, 9.  Supporting the defendant's position was testimony from a civil engineer who, after examining photographs of the sidewalk, indicated "that there [was] no way to tell when the defect that allegedly caused [the] plaintiff's injuries came into existence."  *Id.* ¶ 6.  Moreover, although the defendant was notified of and repaired problems with its sidewalks at other locations, the defendant was never alerted to an issue with the sidewalk where the plaintiff fell.  *Id.* ¶¶ 4, 7-8. The trial court granted the defendant's motion for summary judgment, finding that the defendant had neither actual nor constructive notice of the defect in the sidewalk that caused the plaintiff's fall.  *Id.* ¶ 9.

¶ 56    The appellate court affirmed the order granting the defendant summary judgment.  *Id.* ¶ 24. Concerning constructive notice, the court repeatedly observed that there was "no testimony as to the length of time the defect existed."  See, *e.g.*, *id.* ¶ 20.  Neither the plaintiff nor her companion had any prior knowledge of the defect in the sidewalk, and the civil engineer, who theorized that the defect could have developed in as little as three weeks, had no way of determining how long it existed.  *Id.*

¶ 57    The facts pertaining to notice of the pothole and the malfunctioning light in this case are similar to the facts concerning notice of the defect in the sidewalk in *Zameer*.  Here, no evidence

showed that defendant had actual notice of the pothole or the malfunctioning light before plaintiff fell. Similarly, no evidence indicated that either defect existed for a sufficient time such that knowledge of the dangerous condition could be imputed to defendant.

¶ 58 Plaintiff claims, however, that *Zameer* is inapplicable because, given the sizes of the pothole into which he fell and the other potholes in the Centre Club parking lot, defendant must have known about the pothole that caused him to fall. We disagree. Plaintiff's reference to other potholes in the parking lot is irrelevant. At issue is defendant's knowledge of the specific pothole that plaintiff fell into, not defendant's knowledge of the other potholes in the parking lot. As the court in *Zameer* recognized, the "general condition [of the area where the plaintiff fell] is irrelevant to the cause of [the plaintiff's] fall because the surrounding conditions did not cause [the] fall." *Id.* ¶ 23. As for the pothole that caused plaintiff's injury, we note that the only testimony on pothole formation came from Ollie. His assertion that a pothole may appear overnight made no allowance for the size of the pothole. Again, while Ollie's testimony on this point may seem exaggerated given that plaintiff fell into a pothole in a parking lot and not a major thoroughfare like Lake Shore Drive, plaintiff provided no evidence challenging Ollie's testimony.

¶ 59 Also inapposite is Smith's comment on November 27, 2018—nine days after plaintiff's fall—that both the pothole that injured plaintiff and another pothole in the parking lot were "pretty big." The fact that these potholes were "pretty big" nine days after plaintiff fell is simply not relevant in assessing whether defendant had prior notice of the pothole that caused plaintiff's injuries. It is pure speculation to suggest that the size of the pothole nine days later meant that defendant had notice of it before plaintiff fell, especially given the fact that the parking lot was in continual use those nine days by Centre Club staff, Centre Club members, and those of defendant's

employees who, like plaintiff, were forced to park there because no other parking spots were available.

¶ 60     Relying on *Nguyen*, plaintiff argues that summary judgment should have been denied because a genuine issue of material fact existed concerning defendant's constructive notice of the pothole.  In *Nguyen*, the defendants, a husband and wife, bought a residential building in 1989, which they lived in for many years. *Nguyen*, 2017 IL App (1st) 161272, ¶ 5.  The backyard had a concrete catch basin with a metal lid.  *Id.* ¶¶ 5, 9.  When the defendants bought the property, the husband was told that he should examine the catch basin to ensure that it was not clogged.  *Id.* ¶ 5.  The husband never did so.  *Id.*  However, the husband regularly inspected the backyard, mowed the lawn, shoveled the snow, and fixed anything that was broken in the backyard.  *Id.* ¶ 6.  In doing so, the husband walked over the catch basin.  *Id.*  He also saw others walk over the basin but never noticed or was informed of any issues with the basin.  *Id.*

¶ 61     In 2014, the plaintiff, an associate of the defendants' tenants, was in the backyard when she stepped on the lid of the catch basin.  *Id.* ¶ 7.  The lid flipped up, and the plaintiff was injured when she fell into the well and straddled the edge of the vertical metal lid.  *Id.*  Photographs of the catch basin and metal lid showed that the metal lid was substantially corroded, the concrete basin was cracked, and the concrete lip on which the metal lid rested was substantially deteriorated.  *Id.* ¶ 9.  The plaintiff sued the defendants for negligence, claiming that the defendants failed to exercise reasonable care in maintaining their property.  *Id.* ¶ 11.  The defendants moved for summary judgment, arguing that they did not have actual or constructive notice of the deteriorated condition of the concrete catch basin and metal lid.  *Id.* ¶ 12.  The trial court granted the defendants' motion for summary judgment.  *Id.* ¶¶ 15-16.

¶ 62    The appellate court reversed, finding that "there was evidence from which a jury could conclude that the deteriorated condition of the catch basin existed for a sufficient time that [the] defendants should have been aware of it." *Id.* ¶ 23. Specifically, the defendants lived at the property for many years; the husband maintained the backyard and had walked over the catch basin; and the defendants, despite being told that they should examine the catch basin, never did so. *Id.* Moreover, the photographs showed that the deterioration of the catch basin "was *visible* even when the lid was in place over the well of the catch basin." (Emphasis added.) *Id.* From all of this, the court concluded that

> "[a] reasonable trier of fact could infer from the cracked concrete surface, corroded concrete lip, and rusty lid that the defective condition of the catch basin existed for a sufficient duration to have given constructive notice to [the] defendants, who should have discovered the defect by the exercise of reasonable care." *Id.* ¶ 24.

¶ 63    We find *Nguyen* unpersuasive. Unlike the deteriorated concrete basin and corroded metal lid in *Nguyen*, there was no evidence that the pothole here existed for a sufficient period of time before plaintiff's fall, such that knowledge of the pothole could be imputed to defendant. As noted, the only testimony on pothole formation came from Ollie, who explained that, while a pothole forms over time underneath the pavement surface, it does not manifest until the surface collapses. Thus, until the surface collapsed to form the pothole in question, defendant would have had no knowledge of any problem. According to Ollie, the pothole could have become visible mere hours before plaintiff fell. Again, while Ollie's testimony may seem far-fetched given the pothole's location in a parking lot, it was the only evidence of pothole formation before the trial court. As noted, plaintiff could have retained an expert to rebut Ollie's testimony, but he failed to do so, and he never presented any other evidence establishing when the pothole became visible.

¶ 64    Plaintiff urges this court to rely on a discussion in *Nguyen* of *Baker v. City of Granite City*, 311 Ill. App. 586 (1941). The *Nguyen* court intimated that, in *Baker*, which also involved a plaintiff's fall into a catch basin with a corroded metal lid, the court employed a common-knowledge approach to conclude that the dangerous condition of the rusted lid existed for a sufficient length of time such that knowledge of it could be imputed to the defendant. See *Nguyen*, 2017 IL App (1st) 161272, ¶ 21 (citing *Baker*, 311 Ill. App. at 593). Specifically, in discussing *Baker*, the *Nguyen* court observed:

> "Although no witness had testified about how long the deteriorated condition had existed prior to the plaintiff's injury, the [*Baker*] court stated that '[i]t is a matter of common knowledge that iron will often rust and corrode when exposed to water and weather and that such rust and corrosion do not generally occur to any considerable extent or degree in a short period of time.' " *Id.* (quoting *Baker*, 311 Ill. App. at 593).

¶ 65    Plaintiff suggests that this quote is part of the *Nguyen* court's "reason[ing]" and urges us to impute knowledge of the defects to defendant because (1) "[i]t is common knowledge that potholes, especially those that are 'large' and 'pretty big,' do not generally occur to any considerable extent or degree in a short period of time, but instead will corrode when exposed to water and weather"; and (2) "common knowledge indicates that hardware, like light sensors, can malfunction with use[, and] lightbulbs do not last forever but dim, flicker[,] and eventually expire, especially when exposed to outdoor elements like snow, ice, rain[,] and heat."

¶ 66    For three reasons, we reject defendant's invitation to apply this common-knowledge approach in this case. First, the *Nguyen* court did not expressly adopt a common-knowledge approach in concluding that the defendants had constructive notice of the deteriorated concrete catch basin and corroded metal lid. Rather, the court determined that, given the husband's regular

inspection of and familiarity with the backyard, the defendants, in the exercise of reasonable care, should have discovered the dangerous condition the deteriorated catch basin and corroded metal lid created. *Id.* ¶ 24. Second, as noted, the formation of the pothole here was unlike the corrosion of the metal lid and deterioration of the concrete basin, which, as the *Nguyen* court observed, were "visible." *Id.* ¶ 23. Third, while malfunctioning photosensors and burnt-out lightbulbs may, like deteriorated concrete basins and metal lids, be visible, no evidence was presented here suggesting that the lighting issue "existed for a sufficient duration to have given constructive notice to defendants, who should have discovered the defect by the exercise of reasonable care." *Id.* ¶ 24. Rather, the evidence indicates that there was nothing visibly wrong with the lighting at all until mere seconds before plaintiff fell. That is, the light was not out until immediately before plaintiff fell.

¶ 67                    2. Act's Exclusive Remedy

¶ 68    As an alternative basis to affirm the order granting summary judgment, defendant argues on appeal, as it did in the trial court, that the Act's exclusive remedy provision bars plaintiff from filing a negligence action against it. We find it unnecessary to address this alternative basis.

¶ 69                    III. CONCLUSION

¶ 70    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 71    Affirmed.